In re ANCHORAGE MARINA,
INC., Debtor.

Phillip D. ARMSTRONG, Trustee of the
Estate of Anchorage Marina,
Inc., Plaintiff,

v.

Arnold KETTERLING, Robert B. Hart,
and Hart Agency, Inc., Defendants.

Bankruptcy No. 86–06102.
Adv. No. 87–7095.

United States Bankruptcy Court,
D. North Dakota.

July 20, 1988.

Charles E. Johnson, Bismarck, N.D., for defendant.

John E. Mack, New London, Minn., for Hart Agency, Inc.

Phillip D. Armstrong, Minot, N.D., Trustee.

Edwin Dyer, Bismarck, N.D., for Robert Hart.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is an adversary proceeding by which the trustee seeks to recover payments made by the Debtor, Anchorage Marina, Inc. (Anchorage), to the defendants. The trustee asserts that the payments constituted fraudulent and preferential transfers. Defendants Robert B. Hart and Arnold Ketterling were Anchorage shareholders and directors. Defendant Hart Agency, Inc. was Hart's employer at the time of the transfers. The trustee also seeks turnover of Anchorage accounts receivable and books and records from the defendants. Trial was held on the matter on June 16, 1988. From the testimony and exhibits introduced at the hearing, and the deposition transcript of Jerry Spaedy, the court finds the relevant facts to be as follows:

### Findings of Fact

In late 1985, real estate agent Kit Henegar listed for sale a marina located on North Dakota state park land on Lake Sakakawea. The marina rented and sold boats and had facilities for launching, repairing, and refueling boats. In addition to the boat operation, the marina sold groceries and concessions. After the marina owners had rejected two offers of $800,-000.00 and $900,000.00, Henegar himself made an offer of $1,037,000.00 for the marina. Henegar made the offer without having an appraisal done. The purchase price consisted of $923,000.00 for the marina's tangible assets and $114,000.00 for a covenant not to compete by the former owners. The $114,000.00 payment was termed a "blue sky" payment by the parties. Henegar's purchase offer was contingent upon obtaining financing for the purchase.

Ultimately, Garrison State Bank (Bank) agreed, subject to conditions, to loan Henegar approximately $923,000.00 to purchase

the marina. The financing consisted of four promissory notes. The first note, in the amount of $332,574.00, was secured with the inventory of new boats and motors. This "floor plan" financing was assumed from the prior owners of the marina. The floor plan was a revolving arrangement in which the debt was paid down when the marina sold the boat from its inventory and then increased again when a new boat was purchased. The second note, in the approximate amount of $176,000.00, was used to purchase the marina's rental boat line. The third note, in the amount of $377,827.00, was used to purchase the balance of the non-boat marina assets. The fourth note was an operating loan in the amount of $60,000.00, however, only $36,000.00 was initially advanced. In addition to the financing from the Bank, the former owners agreed to finance the $114,000.00 "blue sky" payment. Thus, the marina purchase was exclusively financed with debt.

As a condition of the Bank's financing, Henegar needed someone to guarantee ten percent (10%) of the amount of the loan. Henegar contacted Hart who agreed to make the guarantee in exchange for a ten percent ownership interest in the marina. Hart also insisted that Ketterling, a Bismarck financial consultant, be brought into the marina project to provide financial expertise. In exchange for his input Ketterling was also to receive a ten percent ownership interest in the marina.

Henegar, Hart, and Ketterling incorporated the marina operation into Anchorage Marina, Inc. Henegar owned eighty percent (80%) of the stock with Hart and Ketterling each owning ten percent. Rather than organizing the corporation so that the shareholders voted in proportion to their ownership interest, however, Anchorage was structured so that each shareholder had one vote. All three shareholders became directors of the corporation.

In addition to being a director, Henegar was also the president of Anchorage and the general manager of the marina. In exchange for his services as manager, the Anchorage board of directors (Board) agreed to pay him $24,000.00 per year. Hart was made the secretary/treasurer of the corporation and Ketterling became the vice-president and chief financial counsel. The Board did not make any provisions to compensate Hart or Ketterling for their services as directors or in any other capacities.

As marina manager Henegar was to develop the operation's basic financial information at the marina. This information would include sales tickets, justified checking accounts statements, cash register tapes, and the basic documents produced by a boat sale. He was then to send the basic data to Ketterling in Bismarck, who would send out billings and produce financial statements.

On April 26, 1986, Anchorage purchased and began operating the marina. Shortly after taking possession of the marina facility the Board made several inventories and discovered that the value of the marina's assets was not equal to its purchase price. A closer inspection revealed that much of the parts inventory was missing. Purchase invoices indicated that this inventory should have been included in the marina purchase. A closer inspection also revealed that some boats were missing and many of the tools from the shop were gone. The Board had to spend $15,000.00 to make the repair shop serviceable. Also virtually every new boat in the floor plan inventory had been cannibalized for parts in some way. Almost immediately after Anchorage began operating it became apparent that Henegar was not capable of managing the marina's finances. From its inception Anchorage's creditors were not being paid and it was plagued with checking account overdrafts. Henegar was unable to correctly generate basic financial information and get it to Ketterling. Ketterling and Anchorage's accountant, Jerry Spaedy, did not receive sufficient information to produce the company's first financial statements until the end of August. Henegar did not forward the information necessary for Ketterling to send out billings. Consequently, in some cases customers who had purchased boats in June were not billed for them until August. At a July meeting the

Board decided that running the marina was too complex for Henegar and that he should be replaced with another more experienced manager and moved into a public relations position. This decision was not implemented at that time.

In addition to the management problems Anchorage also developed difficulties with its financing from the Bank. Ketterling met with a bank officer on June 3, 1986. At the meeting the bank officer informed Ketterling that Anchorage would not be allowed to draw any of the $24,000.00 remaining on its operating loan. Ketterling responded that Anchorage was already, in his opinion, insolvent. He further stated that without the balance of the operating loan Anchorage would be forced into bankruptcy. The Bank, however, did not relent on its decision regarding the operating loan. Moreover, it indicated that it was going to discontinue the floor plan financing. Following this meeting Anchorage began selling its floor plan boats at cost or less in an attempt to have its floor plan inventory liquidated by September 1, 1986.

On August 1, 1986, while Henegar was away on his honeymoon, Hart and Ketterling went to the marina office and took all of the books and records from Henegar's desk. From this point onward Henegar was effectively ousted from his position as manager and Ketterling took over the marina operation. Before this point Ketterling had not invested a substantial amount of time into Anchorage's operation. In the condition the records were in at that time a CPA firm would have charged $3,000.00 to conduct a full audit to straighten them out.

Just before Labor Day weekend in 1986 the Bank called a meeting with the Board. The Bank's representative stated that they were giving serious consideration to foreclosing on the marina assets shortly after Labor Day weekend unless Anchorage was able to demonstrate that its operation could be turned around. At this meeting Ketterling suggested that Anchorage file a Chapter 11 bankruptcy petition but the Bank resisted the idea.

By August 31, 1986, Anchorage's accountant finally had enough data with which to prepare financial statements. The balance sheet for that date indicates that Anchorage had assets of $965,758.00; liabilities of $995,886.00; and a negative capital balance of $30,128.00. The balance sheet states assets at their acquisition cost including the dock system which was carried at $235,000.00. The balance sheet does not include the covenant not to compete as an asset. The liability section does not include the corresponding $114,000.00 debt for the covenant to the former owners of the marina. The income statement prepared for the four months ending August 31, 1986, indicates that over the four months in which it operated it incurred a net operating loss of $30,128.00.

Immediately after Labor Day, Ketterling called a special meeting of the Anchorage Board. At the meeting Hart and Ketterling asked Henegar to formally resign from the Board and as marina manager and to turn his stock into the Anchorage treasury. Henegar refused to resign but, by a vote of two to one, the Board fired him as manager.

The next day, September 3, 1986, Ketterling submitted a bill to Anchorage for his services as a financial consultant. He charged Anchorage for 367 hours at $40.00 per hour for a total of $14,680.00. On the same day Hart submitted a bill to Anchorage for $8,195.58. This amount represented what Hart felt his time spent working on Anchorage business during Hart Agency business hours, and the clerical services which Hart Agency had expended on Anchorage business, were worth. On the same day that the bills were submitted Hart and Ketterling signed two Anchorage checks to pay the bills; check #1152 to Hart Agency, Inc. in the amount of $8,195.58; and, check #1153 to National Leasing Associates (National) in the amount of $14,680.00. National is a company solely owned by Ketterling. On the stubs for both checks appears the following description: "Board fees, services & expenses, April thru August, 1986." Neither Hart Agency, Inc. nor National had any contract to provide services to Anchorage. Neither Hart nor Ketterling had pre-

viously requested any type of compensation from Anchorage for their services.

Hart was the president of Hart Agency, Inc. which is an insurance agency. His father, Robert M. Hart, was the sole shareholder. Robert B. Hart made the following endorsement on the check from Anchorage to the Hart Agency:

Hart Agency, Inc.

by: /s/ Robert B. Hart

Robert B. Hart, Pres.

Pay to the order of account

0046762

Robert B. Hart, Agent

Account 0046762 is Robert B. Hart's personal checking account. After depositing the check Hart withdrew $6,000.00 in cash from his account and delivered to his father. In addition Robert B. Hart was to have $2,000.00 worth of work done on a lake home that his father was remodeling. The $6,000.00 never entered a Hart Agency bank account or the agency's bookkeeping system. Rather, Robert M. Hart kept the cash in his home. He subsequently died and the cash was included in his probate estate.

On December 15, 1986, Hart and Ketterling signed a bill of sale transferring a $25,000.00 boat from Anchorage's inventory to Ketterling. Ketterling did not pay any money for the boat. He did not receive the benefit of this transfer, however, because on December 24, 1986, the Bank filed an involuntary Chapter 7 petition against Anchorage and the boat transferred to Ketterling was recovered into the bankruptcy estate.

As of the date of filing the floor plan inventory had been sold down somewhat and the Bank had repossessed the marina's rental boats on September 15, 1986. Thus, by the date of filing Anchorage's debt to the Bank was $584,029.00. During early 1987 the balance of the marina's assets were sold for the following amounts:

| | |
|---|---|
| Steel building | $ 30,000.00 |
| Dock system | $ 90,000.00 |
| Boat moving equipment | $ 2,000.00 |
| New boat inventory | $187,720.00 |
| Parts, tools, equip., & used boat inventory | $ 30,280.00 |
| Concession inventory | $ 3,425.00 |
| Total | $343,425.00 |

### Conclusion of Law

1.

■ The first issue presented by this case is whether the Anchorage checks issued on September 3, 1986, to Hart Agency and National constitute fraudulent transfers under section 548 of the Bankruptcy Code. Section 548, in part, provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

\*       \*       \*       \*       \*       \*

11 U.S.C. § 548. The trustee has advanced his claim to the transfers under both section 548(a)(1) and section 548(a)(2). Section 548(a)(1), the "actual fraud" section, enables the trustee to pursue payments made by a debtor with the actual intent to defraud a creditor. In this case the creditor allegedly defrauded by the transfers was the Bank. Fraud is "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another...." 3 *Collier on Bankruptcy* ¶ 523.08[5] at 523–52 (15th ed. 1988). Section 548(a)(2) is the "implied fraud" section. It allows the trustee to recover transfers that were made under such suspicious circumstances that they are conclusively presumed to have been fraudulent without any proof of the debt-

or's actual mental state. 4 *Collier on Bankruptcy* ¶ 548.03 at 548–50 (15th ed. 1988). Actual fraud under section 548(a)(1) must be proven by clear and convincing evidence. *See In re Wightman*, 36 B.R. 246, 250–51 (Bankr.D.N.D.1984). Implied fraud under section 548(a)(2), however, is subject only to the preponderance of the evidence burden. *In re Warner*, 65 B.R. 512, 518–19 (Bankr.S.D.Ohio 1986).

The fraudulent intent at issue under section 548(a)(1) is the Debtor's intent. In cases such as this one in which the Debtor is a corporation the intent of the controlling officers and directors is presumed to be the Debtor's intent. *See Chase & Sanborn Corp.*, 51 B.R. 739, 740 (Bankr.S.D.Fla. 1985). In this case Ketterling and Hart together control the majority of the voting rights of Anchorage. Thus, their intent was Anchorage's intent.

Due to the difficulty in proving intent to defraud it may be implied from the circumstances surrounding a transaction. *Wightman*, 36 B.R. at 253; *In re Breuer*, 68 B.R. 48, 51 (Bankr.N.D.Iowa 1985) (the undersigned sitting by designation). A court may decide that there are sufficient indications present in a case to conclude that the Debtor had formed the actual intent to defraud a creditor. *See In re Commercial Candy Co.*, 20 B.R. 292, 294 (Bankr.W.D.Mo.1982). In *Commercial Candy Co.* the court found that the debtor corporation had made a salary payment to a family member of a corporate insider when there was, in fact, no obligation to pay the family member a salary. Moreover, the payment was made while the corporation was insolvent, its business prospects were declining, and within one year of its eventual bankruptcy filing. The court concluded that the facts in the case constituted the confluence of so many badges of fraud as to indicate the presence of an actual intent to defraud. *Id.*

In the instant case several circumstances warrant closer inspection to determine whether they indicate a fraudulent intent. The first of these factors is Anchorage's financial condition over the course of its existence and specifically at the time of the transfers to Hart and Ketterling. Due to its pervasive nature, the company's financial condition forms a backdrop against which additional circumstances may be considered. The Bankruptcy Code defines "insolvency" as the condition that exists when an entity's debts are greater than the fair market value of its property. 11 U.S.C. § 101(31)(A). Anchorage was capitalized entirely with debt. The stockholders did not invest any of their own money into the corporation. Anchorage carried debt exactly equal to the purchase price of its assets. Unfortunately, even at the time of their purchase, the assets were not worth their purchase price. Thus Anchorage was insolvent under the section 101(31)(A) definition at the moment of its creation. Over the operating season of 1986 Anchorage did not generate sufficient profits to pull itself into solvency. Instead the opposite result attended its operation. Henegar mismanaged the marina and the Bank cut-off the marina's operating funds and its floor plan inventory financing. This caused Anchorage to sell floor plan inventory at cost, thus depriving the marina of a major profit producing part of its operation. By August 30, 1986, just a few days before the transfers at issue, Anchorage had incurred operating losses of $30,128.00. Consequently, the company's balance sheet for that date indicates an insolvency in the amount of $30,128.00. The defendants argue that if the covenant not to compete were added to the assets side of the balance sheet, at its purchase price of $114,-000.00, the balance sheet would indicate that Anchorage was solvent. Without considering what the true value of the covenant was, the court notes that the corresponding debt incurred to purchase the covenant is not reflected on the liability portion of the balance sheet. Hence, inclusion of the covenant would have no reducing effect on the company's $30,128.00 insolvency on August 31, 1986.

The insolvency reflected on the August 31, 1986, financial statements would be greatly magnified if the balance sheet were modified to reflect the fair market value, rather than the historic purchase cost, of Anchorage's assets. For example, the

dock system carried on the balance sheet at $235,000.00 was sold post-petition for only $90,000.00. Post-petition sales prices are good indications of pre-petition property values. *Fitzgerald v. Davis*, 729 F.2d 306, 308 (4th Cir.1984). Thus the court concludes that the excess of Anchorage's debts over the value of its property on August 31, 1986, reflecting a dock system value of $90,000.00, was at least $175,128.00.

■ Another glimpse into Anchorage's financial situation occurs on the date of filing. On December 24, 1986, Anchorage owed $584,029.00 to the Bank alone. Over the next few months all of the marina's assets were sold for only $343,425.00. Thus on December 24, 1986, Anchorage was insolvent by at least $240,604.00. When no significant changes occur between a date upon which a debtor was insolvent and the date a transfer was made, it may be assumed that the debtor was insolvent on the date of the transfer. *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985); *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 301 (Bankr.Mass.1983). Anchorage's financial situation did not improve between August 31, 1986, and September 3, 1986. Nor did it significantly worsen between September 3, 1986, and December 24, 1986. Accordingly, the court concludes that the Debtor was insolvent at the time of the transfers on September 3, 1986.

■ Another circumstance which bears closer inspection in this case is the fact that the transfers were made, in one instance, to a company wholly owned by Ketterling, and in the other case to a company of which Hart was the president. Both Hart and Ketterling were directors of Anchorage. Corporate directors occupy a fiduciary relationship to the corporation and its creditors. *In re Decker*, 36 B.R. 452, 456–57 (D.C.N.D.1983). Because directors have access to special knowledge concerning a corporation's finances, transactions between a debtor corporation and its directors are subject to close scrutiny. *In re Tri–State Paving, Inc.*, 32 B.R. 2, 4 (Bankr.W.D.Pa.1982) (citing *Hines Western Pine Co. v. First Nat'l. Bank of Chicago*, 61 F.2d 503 (7th Cir.1932)). Corporate transfers to a director within one year preceding a bankruptcy filing are generally considered threshold evidence of a fraudulent intent. *Tri–State Paving, Inc.*, 32 B.R. at 4. In this case the transfers took place less than four months before the eventual filing.

■ A further indicia of fraudulent intent is present when transactions between closely related entities are made for inadequate consideration. *See In re Bateman*, 646 F.2d 1220, 1222 (8th Cir.1981). Anchorage's articles of incorporation and bylaws contained no provision that directors would be compensated for their services. Further the Board never passed any resolution indicating that directors would be paid. No employment contracts existed between Anchorage and Hart or Ketterling. Nor had Anchorage entered into any contracts with Hart Agency, Inc. or National. In short, Anchorage had no obligation whatsoever to make a payment to Hart or Ketterling or their companies. Even if contracts had existed, the bills submitted by Hart and Ketterling were disproportionate to the value of their services. The bills were essentially for managing the marina for the month of August and straightening out the bookkeeping system. Henegar had been paid $2,000.00 per month to manage the marina and a CPA firm would have charged $3,000.00 to correct the bookkeeping system. Hart and Ketterling charged $22,875.00 for these same tasks. For this reason, the court concludes that the transfers were made without adequate consideration.

The timing of the transfers also indicates the existence of a fraudulent intent. During the approximately four months of Anchorage's operation Hart and Ketterling never sought compensation for their services. During the same time 80% stockholder Kit Henegar was actively involved in the control of Anchorage. On September 2, 1986, Hart and Ketterling voted to remove Henegar from management. This act completed Henegar's isolation from Anchorage's day-to-day operation which began Au-

gust 1, 1986, when Hart and Ketterling seized control of the records. On September 3, 1986, with little chance that Henegar would discover what they were doing and object to it, Hart and Ketterling wrote checks to pay for their services to Anchorage.

The final indication of a fraudulent intent in this case is the attempt by Hart and Ketterling to transfer a $25,000.00 boat covered by the Bank's security interest to Ketterling without paying for it. This attempt indicates a willingness on the part of Hart and Ketterling to transfer corporate assets for their own benefit without regard to Anchorage's creditors.

■ The court concludes that the circumstances discussed above warrant the conclusion that the transfers were made with the actual intent to defraud creditors by taking funds out of an insolvent corporation. In addition, the court also concludes, for the reasons discussed above, that Anchorage was insolvent at the time of the transfers and the corporation did not receive reasonably equivalent value for the transfers. Thus the payments constituted fraudulent transfers under both section 548(a)(1) and section 548(a)(2).

### 2.

■ Even a transfer found to be fraudulent under section 548(a) might not be recoverable from the transferee. Section 548(c) provides that a fraudulent transfer is not recoverable when the transferee received the transfer for value and in good faith. Transferees are not acting in good faith when they have knowledge sufficient to put them on at least inquiry notice of the debtor's possible insolvency. *In re Windsor Industries*, 459 F.Supp. 270 (N.D.Tex. 1978) (citing *Davis v. Hudson Trust Co.*, 28 F.2d 740 (3rd Cir.1928)). Hart and Ketterling had ample information indicating that Anchorage was insolvent. Additionally, since Hart and Ketterling participated in the indications of fraud discussed above in section 1, the court is unable to conclude that they were acting in good faith when they received the transfers.

■ With regard to the Hart Agency, the court notes that generally knowledge acquired by an agent is imputed to a corporation. *First Nat'l. Bank of Sikeston v. Transamerica Ins. Co.*, 514 F.2d 981, 986 (8th Cir.1975). However, an exception to the general rule exists when the agent is independently participating in a fraudulent transaction. *Id.* Hence, the knowledge possessed by Hart at the time of the transaction which precluded the conclusion that he was acting in good faith is not imputed to Hart Agency, Inc. Even if the agency was acting in good faith, however, it still must have given value to qualify for the section 548(c) exception. Section 548(d)(2)(A) defines "value" for purposes of section 548 as including the "satisfaction ... of a present or antecedent debt of the debtor." In the current case the payment from Anchorage to Hart Agency, Inc. was ostensibly to pay a debt for the services of Robert B. Hart and the agency clerical staff. Section 101(11) defines a debt as "liability on a claim." Section 101(4) defines a claim as a "right to payment." As discussed above there was no contract or agreement between Anchorage and the Hart Agency. Neither, then, was there a "right to payment." Thus Hart Agency did not receive the transfer for value and does not fall within the exception of section 548(c). Having concluded that the defendants are liable under section 548 it is unnecessary to address the trustee's claim under section 547.

### 3.

The third issue in this case is whether judgment resulting from the fraudulent transfer should be entered against Hart, the Hart Agency, or both. Section 550(a), in part, provides:

(a) ... to the extent that a transfer is avoided under section ... 548 ... the trustee may recover, for the benefit of the estate, the property transferred ... from—

1. The initial transferee of such transfer or the entity for whose benefit such transfer was made; or

2. Any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). The trustee argues that the Hart Agency, Inc. was the initial transferee of check #1152 and Hart was the immediate transferee of the initial transferee. Thus the trustee asserts that he is entitled to judgment against both Hart and the agency, although he is limited by section 550(c) to a single satisfaction of multiple judgments obtained under section 550(a). The Hart Agency argues that it never received the money and it would be inequitable to enter judgment against it. Similarly Hart argues that he did not receive the benefit of the money. Rather he was merely the mechanism by which the funds were transferred from Anchorage to his father, Robert M. Hart.

Section 550(a) was an attempt by Congress to stop the situation present under the old Bankruptcy Act in which fraudulent transfers were run through third parties before being accepted by their intended recipient, thereby frustrating the trustee's recovery of the transfer. *See In re Queen City Grain, Inc.*, 51 B.R. 722, 726 (Bankr. S.D.Ohio 1985). When Congress passed section 550(a) of the Bankruptcy Code it corrected the problem present under the Act by giving the trustee the flexibility to recover from any transferee in the chain. 4 *Collier on Bankruptcy* ¶ 550.02 (15th ed. 1988). In some instances, however, the literal application of section 550(a) can produce an inequitable result by allowing the trustee to recover from an innocent third party who did not participate in the fraud. *Id.* In such cases courts have used their equitable powers and carved out what is essentially an equitable exception to section 548(a) in cases in which the transferee is simply a conduit through which the intended transferee receives the benefit of the transfer. *See Id; In re Black & Geddes, Inc.*, 59 B.R. 873, 875 (Bankr.S.D.N.Y. 1986); *In re Columbian Coffee Co., Inc.*, 64 B.R. 585, 586 (Bankr.S.D.Fla.1986). *Cf. In re Mill St. Inc.*, 71 B.R. 670, 671 (Bankr. N.D.Cal.1987) (implying that exception was available but not appropriate in the case then under consideration). In *Black and Geddes* the court refined the exception with the following test originally advanced by Justice Cardozo in a case dealing with preferences under the Bankruptcy Act:

The person to be charged with liability, if he has parted before the bankruptcy with title and possession, must have been more than a mere custodian, an intermediary or conduit between the bankrupt and the creditor. *Directly or indirectly he must have had a beneficial interest in the preference to be avoided*, the things to be reclaimed.

*Black and Geddes*, 59 B.R. at 875 n. 4 (emphasis added) (quoting *Carson v. Federal Reserve Bank*, 254 N.Y. 218, 172 N.E. 475 (1930)).

In the instant case the Hart Agency did not receive the money from Anchorage. Its only connection with the check from Anchorage was that its name appeared as payee. The court concludes that the agency never received any beneficial interest from the transfer and it functioned only as a conduit. Accordingly, Hart Agency, Inc., qualifies for the equitable exception to the operation of section 550(a).

Hart asserts that he also was a conduit of a payment from Anchorage to his father. As noted above, however, this "conduit" exception is equitable in nature and designed to protect innocent third parties. As discussed in section 1, Hart actively participated in making the fraudulent transfer. Accordingly, the court concludes that he is not an innocent third party deserving of equitable protection.

### 4.

Ketterling raises the argument that he is equitably entitled to retain the $14,680.00 payment under the theory of quantum meruit. He argues that his services provided substantial benefit to Anchorage by straightening out the books. However, as discussed above, the fees he charged to Anchorage were grossly disproportionate to the value of his services. Moreover, quantum meruit is an equitable remedy and Ketterling's involvement in the fraudulent actions discussed above precludes him from any recovery on an equitable basis.

### 5.

Finally, by his complaint the trustee seeks to recover accounts receivable which

he alleges Hart and Ketterling were in possession of at the time of the filing. He also seeks turnover of other books and records allegedly in the possession of Hart and Ketterling. On February 11, 1988, this court entered an order directing Hart and Ketterling to "immediately turn over to the trustee any and all corporate books, documents, records, papers and recorded information of any source pertaining to the affairs of the Debtor, Anchorage Marina, Inc., as may be in their possession." The trustee has not proven that the February 11, 1988, order has not been complied with and that Hart and Ketterling are now in possession of Anchorage records or accounts receivable.

Accordingly, for the reasons stated, IT IS ORDERED THAT Anchorage Marina, Inc. check # 1152 to Hart Agency, Inc., in the amount of $8,195.58, and check # 1153 to National Leasing Associates in the amount of $14,680.00 are declared to be fraudulent transfers. IT IS FURTHER ORDERED that the trustee may recover for the estate $14,680.00 from National Leasing Associates or Arnold Ketterling, and $8,195.58 from Robert B. Hart.

LET JUDGMENT BE ENTERED ACCORDINGLY.