**In re DAKOTA DRILLING, INC., Debtor.**

**Phillip D. ARMSTRONG, Trustee, Plaintiff,**

v.

**Olen PEDIE and Linda Pedie, Defendants.**

**Bankruptcy No. 86–05642.
Adv. No. 91–7032.**

United States Bankruptcy Court, D. North Dakota.

Dec. 2, 1991.

Phillip D. Armstrong, Minot, N.D., Trustee.

Orlin W. Backes, Minot, N.D., for defendants.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This is a complex, multi-faceted proceeding commenced by complaint filed on April 5, 1991, by the trustee who, in some 17 pages, detail circumstances he believes establish the defendants to be the alter ego of the Debtor, Dakota Drilling, Inc. (Dakota Drilling), and who he believes engaged in a series of transactions with themselves and with others which were preferential, fraudulent or both. The trustee is seeking the recovery of real and personal property as well as cash. Recovery is premised upon sections 547, 548 and 549 of the Bankruptcy Code as well as chapter 13–02.1–04 of the North Dakota Century Code.

Trial was held on October 2, 1991. From the evidence adduced at trial the facts as material are as follows:

### Findings of Fact

#### 1.

For a number of years the defendants, Olen and Linda Pedie, were sole proprietors of a North Dakota business known as Pedie Construction whose primary business was oil well site preparation and oil rig transportation. Pedie Construction had a 20% interest in an oil drilling rig it managed for a drilling company known as South Ranches and in which it had a first option to purchase for $600,000.00.

In September 1983, the Debtor, Dakota Drilling, Inc., was incorporated with Olen and Linda Pedie as its principal officers. Dakota Drilling was formed to own and operate drilling rigs and maintain a drilling business. It filed for relief under Chapter 11 on July 29, 1986, and eventually converted to Chapter 7 in 1989.

In 1983 Dakota Drilling purchased the South Ranch rig for $600,000.00 by means of a $500,000.00 loan from Centerre Bank and a $100,000.00 loan from Earl Schwartz. As security for the bank loan the bank was given a blanket security interest in all machinery and equipment of every kind now owned or hereafter acquired. The security interest covered not only the financed rig but two later-acquired rigs as well. The bank loan was personally guaranteed by Olen Pedie as well as by Earl Schwartz.

Two more drilling rigs were purchased by Dakota Drilling by means of loans from Earl Schwartz. Three hundred sixty thousand dollars was borrowed on rig No. 2 and $230,000.00 was borrowed on rig No. 3. The indebtedness to Schwartz was not memorialized by any promissory note nor is there in evidence a security agreement by which Schwartz was extended a security interest in the rigs.

Earl Schwartz at some point became an officer of Dakota Drilling and also held an interest in a well operating company known as Gofor Oil, Inc. According to Olen Pedie, Dakota Drilling was to satisfy its outstanding indebtedness to Schwartz by drilling wells for Gofor thereby creating a debt exchange.

In August 1985, Dakota Drilling purchased a 1980 Load Craft platform trailer for $39,000.00 and an I.H. Paystar Semi Tractor for $16,000.00. The trailer, although purchased by Dakota Drilling, was titled in the name of Pedie Construction Company. This trailer, worth $12,000.00 at the time of Dakota Drilling's Chapter 11 filing, never appeared in its schedule of assets. The ownership transfer to Pedie Construction took place in 1988 during the pendency of the Chapter 11. The I.H. semi-tractor, worth $35,000.00 at the time of the Chapter 11 filing, was, as was the trailer itself, a part of the collateral given to Centerre Bank as security.

Also in 1984 Dakota Drilling purchased an I.H. T–D 20 crawler tractor from Northwestern Equipment for $220,000.00 with financing through CIT Corporation. This obligation was personally guaranteed by Olen and Linda Pedie. From December 1984 through July 2, 1986, Dakota Drilling paid CIT a total of $62,000.00 on this obligation.

#### 2.

In January 1986, Olen and Linda Pedie d/b/a Pedie Construction purchased a commercial building in Botteneau, North Dakota for use as a shop and business office by both Pedie Construction and Dakota Drill-

ing. As used, Dakota Drilling occupied approximately 95% of the space. The source of funds for the purchase was two checks from Dakota Drilling aggregating $180,000.00 payable to Pedie Construction. The checks, both bear the notation that they were a "loan" for building acquisition. No promissory note or mortgage was given to Dakota Drilling. Dakota Drilling's corporate minutes confirm that this was in the nature of a loan to be paid back by way of rig moves and other jobs contracted with Pedie construction. Shortly after acquisition, Pedie began to renovate the premises by means of Dakota Drilling funds. Office equipment and furniture were purchased in an amount of $10,700.45 and remodeling materials were purchased in the sum of $7,232.00.

After acquiring the building, the Pedies, d/b/a Pedie Construction, in April 1986 borrowed $40,000.00 against it from the State Bank of Botteneau, giving the bank a $40,000.00 mortgage as security. This loan was renewed in 1987 (after Dakota Drilling was in Chapter 11) along with new money of $90,000.00 for a total new note of $130,000.00.

Dakota Drilling occupied the premises from 1986 through 1988 under a rental agreement which, according to Olen Pedie, required Dakota Drilling to pay all remodeling and insurance. Pedie stated that rent would have been around $2,500.00 to $3,000.00 per month and that at the time of building acquisition in January 1986, Dakota Drilling owed Pedie Construction $200,000.00.

### 3.

After its inception, Dakota Drilling used its three rigs to do contract drilling for a number of well operators including Gofor Oil and Earl Schwartz. Between September 1983, and September 1989, its jobs included 22 wells for Gofor and 2 wells for Earl Schwartz. Business was good up until April 1986, when the oil industry in western North Dakota experienced a general depression. Between January 1985 and January 1986, oil prices plummeted from $24.00 per barrel to $12.50 per barrel. This caused not only a depression for the drilling market but resulted in an extreme erosion of value for oil-related equipment including rigs. As a result, Dakota Drilling's work evaporated and it filed for relief under Chapter 11 in July 1986. Business picked up somewhat post-petition but not enough for a recovery and the case was converted to a Chapter 7 in January 1989. From its inception until it went into Chapter 7, Dakota Drilling had total drilling revenues of $7,202,368.00.

Earl Schwartz, as co-guarantor of the Dakota Drilling obligation to Centerre Bank paid off the remaining debt of $475,387.00 in 1989 and took an assignment of the bank's security interest which, among other things, were oil drilling rigs, inventory and accounts. He moved for relief from stay which was stipulated to by the trustee and recovered the collateral including the three rigs, the I.H. semi-tractor and Load Craft trailer. As of July 1986, the three rigs were worth $379,770.00. The semi-tractor was worth $35,000.00 and the trailer was worth $12,000.00.

At the time of conversion to Chapter 7, Olen and Linda Pedie incorporated a new drilling company named Centennial Drilling, Inc. This company is engaged in the same business as was Dakota Drilling and occupies the same place of business with the same telephone number and post-office box number. It is using the same three drilling rigs and semi through means of a leasing arrangement with Earl Schwartz.

### 4.

Over the period of Dakota Drilling's operation it engaged Pedie Construction to perform rig hauling, and well site preparation for which it was billed by Pedie Construction. Invoices from Pedie Construction to Dakota Drilling covering the period November 1983 through December 1986 show the total invoice billing of $425,304.00. When Dakota Drilling advanced the $180,000.00 to Pedie in January 1986 for purchase of the building there was $214,414.00 in outstanding unpaid invoices. Olen Pedie testified that the $180,000.00 was written off as a payment against invoiced but unpaid rig moves.

#### 5.

From 1984 through 1988 cash was taken out of Dakota Drilling deposits and during this same period a number of Dakota Drilling checks were made payable to cash and negotiated by Olen and/or Linda Pedie. Although a review of Dakota Drilling's ledgers establish this fact, neither the ledgers nor the accountant testifying on behalf of the trustee could identify what the cash was used for. From 1985 through 1988 Dakota Drilling received checks from Maxbass Natural Gas Co., an oil producer, and all of these checks totaling $4,261.87 were negotiated for cash by either Olen or Linda Pedie. Olen stated, in explanation of these cash transactions, that it was common to deal in cash and the cash taken out was used to pay for supplies, rig parts and other items incidental to Dakota Drilling's business. The trustee's accountant agreed that Dakota Drilling had been put on a cash basis by a lot of people and that he could find no evidence of doubled-up payments. It is worthwhile noting that the trustee's accountant did not perform an audit and could not point to any irregular use of Dakota Drilling funds by Pedies themselves or Pedie Construction.

From its inception in 1983 until January 1988, Dakota Drilling paid Olen and Linda Pedie a monthly salary which gradually diminished from an average of $4,247.00 for each of the last three months of 1983 to $2,065.00 per month in 1986 and finally, to $2,300.00 for January 1988 when payments stopped completely. The trustee's accountant testified that on their face the Dakota Drilling payroll ledgers did not reveal anything unusual.

In addition to taking fairly extreme salary cuts as Dakota Drilling slid into difficulty, Pedies in a further effort to keep it going, made payments to Dakota Drillings outstanding accounts by issuing checks from Pedie Construction totaling $17,879.00.

#### 6.

Earl Schwartz' relationship with Dakota Drilling is viewed with some question by the trustee. As before noted, Dakota Drilling drilled all of Schwartz' wells by use of equipment financed through the Centerre Bank loan and guaranteed by Schwartz or equipment financed by Schwartz himself. The trustee believes Dakota Drilling undercharged Schwartz and his company, Gofor Oil, but there is no evidence of this. It appears that Dakota Drilling kept separate accounts of all its drilling operations and used a recognized accounting firm to reconcile its drilling charges. Schwartz and his company, Gofor Oil, also maintained separate financial records and these records show that Earl Schwartz advanced $768,000.00 to Dakota Drilling for the purchase of the three rigs and in addition, made further cash advances of $528,000.00 to Dakota Drilling which, according to Schwartz' accountant, was not unusual. Schwartz commonly made cash advances to drilling companies and his accountant testified that he didn't see anything unusual in the cash transactions with Dakota Drilling. Gofor Oil company records show that after being credited for wells drilled, Dakota Drilling owed it $312,000.00 as of December 1984.

#### 7.

By June 1985, Dakota Drilling was unable to continue making payments on its debts to Centerre Bank and reached an agreement with Schwartz in September 1985, whereby he assumed responsibility for the bank note and released Dakota Drilling from any further liability to him in respect of unpaid cash advances. In return, Dakota Drilling released Schwartz from all accounts receivables owing by him or Gofor Oil to Dakota Drilling. From the records it is impossible to detail precisely what was outstanding by each entity at the time of this agreement but it appears that Dakota Drilling by June 1985, had an outstanding bank debt of $415,000.00 plus something in the area of $590,000.00 owing Schwartz for outstanding cash advances. On the other side, Earl Schwartz owed Dakota Drilling something in the area of $395,475.00. These figures are taken from Dakota Drilling's financial statement as well as accounting records maintained by each of the companies. From these figures

it appears that Schwartz got the short end of the deal by approximately $610,000.00.

In February 1989, after the case had been converted to Chapter 7, Centerre Bank called Schwartz on his guarantee and he paid the bank $475,347.00 taking in exchange an assignment of its blanket security interest in property, which by that time had experienced significant value declines. By July 1986, the three rigs, originally worth $778,000.00 had fallen to $379,800.00 in value. By recovery of the three rigs and other pieces of equipment, Schwartz, over time, was able to recoup a portion of his loss on the Dakota Drilling settlement.

On February 17, 1989, Earl Schwartz filed a motion to lift the stay to allow him to acquire the property assigned to him by Centerre Bank which included the Load Craft trailer. The trustee initially objected to the motion, but withdrew his objection on March 28, 1989, and consequently Schwartz's motion to lift the stay was granted. Dakota Drilling, on April 7, 1989, filed its final report and account on its conversion to a Chapter 7 which contained no mention as to the existence of the trailer. After the appointment of the Chapter 7 trustee, Dakota Drilling did not cooperate with the trustee in connection with the review of the financial date. As a result, the trustee on October 29, 1991, filed a motion requesting a turnover of all checks, bank statements, documentations and records from Dakota Drilling. On November 16, 1991, the trustee withdrew his motion directing the turnover of the collateral.

8.

No one could anticipate the extreme economic slide that was to shake the oil industry in 1986. The average price of North Dakota oil in December 1985, was $24.75 per barrel and by April 1986, it was down to $9.87 per barrel. This, of course, greatly affected Dakota Drilling's business and its balance sheet. As of December 1985, Dakota Drilling had total assets of $1,586,-000.00 inclusive of equipment worth $928,-000.00 and liabilities of $9,732.00 leaving a net equity of $655,000.00.

In July 1985, just several months prior to the Schwartz settlement, the collateral pledged to Centerre Bank and CIT was worth $1,043,000.00 against a secured debt of approximately $475,000.00 owing to the bank and CIT. By the time Dakota Drilling filed for protection under Chapter 11, the value for the same assets had fallen to only $526,000.00. Given the asset base and liabilities it appears that Dakota Drilling was solvent up until July 1986. In fact, its schedules filed in July 1986 reveal that liabilities exceed assets by only $10,000.00 at that time.

The TD-20 crawler was worth $270,-000.00 in July 1985, and had declined to $100,000.00 by July 1986. During this period of time the remaining indebtedness was approximately $100,000.00 which was guaranteed by Olen Pedie. From 1984 through July 1986, monthly payments of $6,865.00 were made except for five missed payments. Although a total of $62,000.00 in payments were made to CIT during this period, the units value never fell below $100,000.00.

Centerre Bank also continued to receive payments from Dakota Drilling up until March 1986. For the year preceding the Chapter 11 filing, a total of $70,561.00 in payments were made but, as before noted, the bank held collateral which was worth more than the outstanding indebtedness.

9.

The foregoing discussion is based upon a review of a considerable number of documents, none of which suggests that Pedie Construction, Dakota Drilling, Earl Schwartz or Gofor Oil Company were not acting as separate entities, with separate accounts. There does not appear to be a duplication of payments and while cash-out transactions at first blush, appear somewhat unusual, accountants testifying for different sides could not find them so and indeed said it was common, particularly where a company is required to deal on a cash basis. The books and records introduced by Dakota Drilling appear fairly complete and suggest to the court that Dakota Drilling did maintain a business separate and apart from that of Pedie Construction.

884

*Conclusions of Law*

**1.**

█ The trustee requests the court to find that the Pedies are the alter ego of the Debtor corporation and that they are personally liable for the debts of Dakota Drilling, and that Dakota Drilling's corporate existence be disregarded. The trustee does not identify from where his power to invoke an alter ego remedy was derived, but as the Eighth Circuit in *In re Ozark Restaurant Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir.1987), acknowledged, the general law mandates that the piercing of a corporate veil must never be made for the benefit of the corporation or its shareholders. It is troublesome, in this court's view, to allow a corporation, through its trustee, to pierce its own veil since it would have the effect of denying the corporation of its own corporate existence. Thus, as the logic of *Ozark* dictates, this court must conclude the trustee has no standing to pursue the alter ego remedy.

█ Even if the trustee had standing to raise an alter ego remedy, he nonetheless has to satisfy the requisite elements, as set forth in *In re Haugen Construction Services, Inc.*, 104 B.R. 1013 (Bankr.D.N.D.1989), in order to pierce Dakota Drilling's corporate veil. As this court noted in *Haugen*, citing to *Hilzendager v. Skwarok*, 335 N.W.2d 768 (N.D. 1983), some significant factors for determining whether to disregard the corporate entity in the present case include: siphoning of funds by the dominant shareholder; absence of corporate records and failure to maintain corporate formalities; and the mere existence of the corporation as a facade for promoting individual dealings. *Id.* at 1019–20. The burden of establishing a basis for piercing the corporate veil rests upon the party asserting the claim. *Jablonsky v. Klemm*, 377 N.W.2d 560 (N.D. 1985). From the records and testimony adduced at trial, the trustee has not met this burden.

The facts demonstrate that the Pedies took cash out of Dakota Drilling deposits and that they negotiated checks made payable to cash written by Dakota Drilling. At first glance this appears to support the contention that the Pedies siphoned funds for their own benefit; however, nothing in evidence establishes this view. On the contrary, Olen Pedie testified that it was a common practice to deal in cash and explained that the cash taken out was used to pay for materials necessary to operate the business. The trustee's accountant verified that many of Dakota Drilling's business transactions were on a cash basis and that he could not find any evidence of doubled-up payments. The accountant also found nothing unusual with this form of pay arrangement between Dakota Drilling and its creditors. Furthermore, the fact that the Pedies took gradual reductions in their monthly salary due to the hard times facing the oil drilling industry, and that they were willing to make payments totaling $17,879.00 to Dakota Drilling in order to keep the business afloat demonstrates to the court that there was no siphoning of funds by the Pedies.

The trustee further alleges that the Pedies exploited Dakota Drilling by failing to keep the corporate records between Dakota Drilling and themselves separate. As the facts clearly depict, this assertion is not substantiated. The Debtor kept independent accounts of all its drilling operations and maintained books and records of its business affairs which in of themselves were rather detailed and complete. Dakota Drilling had directors, shareholders and kept corporate minutes. Dakota Drilling paid Olen and Linda Pedie a reasonable salary which declined as Dakota Drilling entered closer to bankruptcy. Nothing about the salary arrangement, according to the trustee's accountant, appeared unusual. Furthermore, Dakota Drilling filed its own annual tax return, independent of the Pedies or Pedie Construction. This court finds that the Debtor, Dakota Drilling, did in fact preserve its separate identity apart from that of Olen and Linda Pedie doing business as Pedie Construction.

Additionally, it is the trustee's contention that Dakota Drilling was created to allow the Pedies to use the corporation as a facade for their individual dealings. In sup-

port of this, the trustee points to the mutual releases of debts between Dakota Drilling, Centerre Bank and Earl Schwartz in 1985 and concludes that the Pedies benefitted by the release of their personal debt owing to Schwartz while Dakota Drilling suffered a substantial loss. This claim fails on the basis that Dakota Drilling did not suffer a loss. When Dakota Drilling was unable to pay Centerre Bank on its debt obligation in June 1985, Schwartz assumed responsibility for the bank note and released Dakota Drilling from unpaid cash advances owing to him. Dakota Drilling in return released Schwartz and his company, Gofor Oil, from all accounts receivable derived from the drilling services performed by Dakota Drilling. During this period, Dakota Drilling had accumulated outstanding debts owing to the bank and Schwartz totaling $1,005,000.00; Schwartz and Gofor Oil owed Dakota Drilling approximately $395,500.00 collectively. According to these figures it is obvious Dakota Drilling benefitted from the transaction in the neighborhood of $610,000.00 rather than a loss as the trustee claims.

Finally, the trustee asserts that Dakota Drilling undercharged Earl Schwartz for the drilling services rendered. The facts, however, simply fail to support that any under-the-table transactions between Dakota Drilling and Schwartz existed. Both Dakota Drilling and Schwartz kept separate financial accounts of the drilling charges under recognized accounting practices. Gofor Oil's and Schwartz' records clearly account for the money advances and credit still owing to them by Dakota Drilling. No evidence suggests that any secret dealings were entered into for Dakota Drilling's services.

From the foregoing this court concludes that there is no reason to disregard the corporate entity of Dakota Drilling and hold the Pedies personally liable. The Pedies are not the alter ego of the Debtor corporation, Dakota Drilling.

### 2.

In order for the trustee to prevail under his claim that the pre-petition transfer of office property paid for by Dakota Drilling's fund and the improvements for the Dakota Drilling office were preferential or fraudulent transfers, the provisions of 11 U.S.C. § 547 and 11 U.S.C. § 548 must be satisfied.

### a.

Section 547(b) sets forth the elements necessary to avoid a preferential transfer which specifically requires, *inter alia*, that the transfers be made "while the debtor was insolvent." 11 U.S.C. § 547(b)(3). Under section 547(f), there is a presumption that a debtor is insolvent on and during the ninety days before the filing of the bankruptcy petition. This presumption, however, is rebuttable by producing evidence of solvency, which the trustee then has the burden of proving the debtor's insolvency. *Clay v. Traders Bank of Kansas City*, 708 F.2d 1347 (8th Cir.1983), *In re Gilbertson*, 90 B.R. 1006 (Bankr.D.N.D.1988). The trustee's preferential transfer argument pursuant to section 547(b) must fail. All transfers in question occurred between January 15, 1986, and June 18, 1986. From the documents produced at trial it appears that Dakota Drilling was solvent up until July 1986. The trustee has not provided contrary evidence as to the Debtor's solvency and thus, the requirement necessary for a preferential transfer under section 547 has not been established.

### b.

A trustee may also avoid a transfer as fraudulent under section 548(a) of the Bankruptcy Code if he can establish the debtor—

(a)(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation

was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)

Pursuant to section 548(a)(1), a transfer of the debtor's property is fraudulent if it was made with *actual intent* to hinder, delay, or defraud a creditor. The North Dakota Century Code § 13–02.1–04's fraudulent transfers provision also requires the existence of an actual intent to defraud. The standard for proving fraud under § 548(a)(1) is the clear and convincing standard. *In re Anchorage Marina, Inc.*, 93 B.R. 686, 691 (Bankr.D.N.D.1988)

The trustee relies on some of the factors this court considered in *Anchorage Marina* to prove fraudulent intent. Such factors include transfers between closely related entities for inadequate consideration, and corporate transfers within one year prior to the bankruptcy petition.

The facts suggest that all but two of the pre-petition transfers at issue appear to be made for adequate consideration. They involve the two transfers on January 15, 1986, and January 21, 1986, both of which were made within one year before the bankruptcy filing. The transfers, consisting of two checks issued to Pedie Construction from Dakota Drilling in the total amount of $180,000.00, were used to acquire the commercial building in Botteneau, North Dakota and were recorded in the corporate minutes as loans to be paid back with rig moves. The memo lines of the checks also contained the notation that the checks are for loans. Even though Dakota Drilling owed Pedie Construction $200,-000.00 at the time of the building purchase, there is no indication from the facts that the $180,000.00 was to offset Dakota Drilling's $200,000.00 obligation owing to them. Furthermore, no promissory note or mort-

gage was given to Dakota Drilling. If as Olen Pedie testified that the $180,000.00 was payment for past rig moves and not for future moves, the court is curious as to why both the corporate minutes and the memo lines of the checks plainly manifest that the monies were for loans rather than payments of prior obligations. The term "loan" implies that money was loaned with the expectation of repayment, and not a discharge of debt obligations. For purposes of section 548, value includes the "satisfaction or securing of a present or antecedent debt of the debtor". 11 U.S.C. § 548(d)(2). This definition does not include promised future payments. Thus, the court does not believe the two check transfers totaling $180,000.00 were made for reasonably equivalent values.

Although this court concludes that the transfers lacked adequate consideration, it does not believe this alone establishes that actual intent necessary to satisfy the fraud requirement of section 548(a)(1). In fact, other factors suggest to the court that the Pedies did not have the actual intent to deceive the creditors. First, Dakota Drilling was solvent at the time the transfers were made. Second, it is doubtful that Olen and Linda Pedie would be willing to personally invest $17,879.00 to keep Dakota Drilling afloat during the drilling industry slump and to take a reduction in salary if they had an intent to commit fraud. Third, during the latter part of 1985 and the early part of 1986, the oil field drilling activity was extremely active, with no indication of a slow down. Based on the superb drilling prospects, the Pedies doing business as Pedie Construction purchased the $180,-000.00 commercial building which Dakota Drilling occupied 95% of the space. It appears the losses suffered by the creditors were the direct result of the difficult times faced by the drilling industry and not the result of the alleged fraud committed by the Pedies. Finally, the facts unquestionably show that the Pedies kept separate and accurate records of the business transactions. If they had the intent to defraud creditors, it would be foolish for them to maintain a detailed paper trail of their business dealings. From the circumstances

discussed, the court finds that the Pedies do not have the actual intent to commit fraud.

Despite the fact that the trustee has failed to establish actual fraud in the present case, he may prevail under section 548(a)(2), the implied fraud provision, if he can show the transfers "were made under such suspicious circumstances that they are conclusively presumed to have been fraudulent without any proof of the Debtor's actual mental intent." *In re Anchorage Marina, Inc.*, 93 B.R. 686, 690 (Bankr. D.N.D.1988). As evidence of fraud, the trustee argues that the transfers were made for inadequate consideration and that Dakota Drilling was insolvent at the time of the transfers. The trustee must show fraud pursuant to section 548(a)(2) by the preponderance of the evidence. *Id.* at 691.

As this court previously concluded, the $180,000.00 transfer was not made for reasonably equivalent value. Although the $180,000.00 transferred for the purpose of the commercial building may not have been for adequate consideration, section 548(a)(2)(B)(i) additionally requires the trustee show that Dakota Drilling was insolvent at the time of the transfers. The evidence clearly establishes the solvency of the Debtor corporation when the transfers were made as discussed *supra*. Thus, the solvency requirement of section 548(a)(2)(B) has not been satisfied.

However, in lieu of proving insolvency the trustee may also prevail under section 548(a)(2)(B)(ii), (iii) or under North Dakota Century Code § 13–02.1–04 upon showing the existence of inadequate consideration as well as establishing that Dakota Drilling engaged in a transaction that would leave it with an unreasonably small capital or incur debts that would be beyond Dakota Drilling's ability to repay the debts. As noted earlier, Dakota Drilling was solvent as of July 1986, meaning its debts did not total more than the aggregate value of all of its property, excluding the alleged fraudulent transfers and exempt property, and when it filed for bankruptcy relief, its liabilities exceeded its assets by only $10,-000.00. Although this court can infer that

Dakota Drilling had difficulties paying its creditors as indicated by the bankruptcy petition, the court does not believe the trustee has met his burden of proof on the issue of unreasonably small capital since many outside factors, such as the general depression of the oil drilling industry, unrelated to the January 15, 1986 and January 21, 1986 transactions, could have played into Dakota Drilling's inability to pay creditors and its decision to file for bankruptcy. Thus, the court finds that the trustee only established that the $180,-000.00 transfer was made for inadequate consideration, but failed to show that Dakota Drilling was insolvent at the time of the transfers at issue or that Dakota Drilling engaged in a transaction which left it unreasonably undercapitalized.

The court concludes for the reasons examined above, that all transfers, except the $180,000.00 for the purchase of the commercial building, were for adequate consideration. Additionally, the court finds that the transfers were not made with the actual or implied intent to defraud creditors by transferring the money to the Pedies and that the transfers were made while Dakota Drilling was still solvent. Thus, the trustee's allegation of fraudulent transfers under both § 548(a)(1) and § 548(a)(2) have not been met.

3.

The trustee's complaint contains two other claims. The trustee seeks to recover the payments made to the Pedies doing business as Pedie Construction and checks paid to cash which were negotiated by the Pedies. The trustee also seeks the recovery of the oil revenue payments from Maxbass Natural Gas to Dakota Drilling which were negotiated by either Olen or Linda Pedie, claiming the transfers were either preferential or fraudulent.

Again, as previously noted, the trustee's burden of proof under the theory of preferential transfers has not been proven because Dakota Drilling was solvent during the time of the transfers. Additionally the claim for fraudulent conveyance also has not been established since it is not uncommon for companies in the oil drilling busi-

ness to operate on a cash basis only. Olen Pedie testified that the revenues derived from Maxbass Natural Gas were converted to cash and the cash taken out of Dakota Drilling's account was to pay for expenses and pay Dakota Drilling's cash basis suppliers. Furthermore, the trustee's own expert witness was unable to show any abuse or misuse of Dakota Drilling funds by either the Pedies or Pedie Construction. The trustee has not proven that the checks negotiated by the Pedies or the oil revenue payments from Maxbass National Gas are preferential or fraudulent transfers.

4.

■ According to the trustee, 11 U.S.C. § 549, grants him the power to avoid the post-petition transfer of the 1980 Load Craft trailer and allows him to recover the trailer or its value. The Code, however, provides that an action brought under section 549(d) must be commenced within two years after the transfer in order to be avoided. It is the trustee's contention that the statute of limitations is tolled by Dakota Drilling's failure to disclose the trailer in its bankruptcy petition and its post-petition vehicle registration in the name of Pedie Construction.

According to *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 293 (8th Cir.1986), the Eighth Circuit recognized that the two-year statute of limitations may be tolled under appropriate circumstances, such as the inequitable conduct of the parties. This conduct need not be active or intentional; in some situations the inequitable conduct may be passive. *In re Bookout Holsteins, Inc.*, 100 B.R. 427, 429 (Bankr.N.D.Ind. 1989). Even so, the law imposes a duty upon the trustee to protect his creditors' interest, despite the misdeed of the debtor by being "reasonably diligent in its efforts to discover the wrong inflicted upon it." *Id.* at 430.

Although the ownership of the Load Craft trailer was transferred in 1988, which is well beyond the two year period the trustee should have filed this adversary proceeding, equity dictates that the two-year statute of limitations period begin to run only after the trustee knew or should

have known of the transfer. The trustee cannot be expected to be cognizant of the trailer transfer before January 24, 1989, the time the case was converted to Chapter 7. Hence, the focus will be on events occurring after the even date to establish when the trustee knew of the transfer in question.

On February 17, 1989, Earl Schwartz filed a motion seeking relief from the automatic stay as a result of Dakota Drilling's failure to pay debts owing to Centerre Bank in the amount of $475,347.00 which Schwartz, as guarantor on the debt, paid. The bank's interests were consequently assigned to Schwartz, presumably, the Load Craft trailer was included in the assignment. Schwartz then moved the court to lift the stay to allow him to seize the collateral, including all machinery, equipment, furniture, fixtures, tools and furnishings now owned or hereafter acquired by Dakota Drilling. The trustee initially objected to the motion, but withdrew his objection on March 28, 1989. On April 7, 1989, Dakota Drilling filed its final report of its conversion from a Chapter 11 to a Chapter 7 case. No reference was made within the report regarding the Load Craft trailer. The trustee then filed a motion on October 29, 1990, after receiving no cooperation from Dakota Drilling, requesting the aid of the court in directing Dakota Drilling to provide the pertinent information necessary to facilitate the trustee's investigation of Dakota Drilling's financial situation. Apparently, by November 16, 1990, the trustee received all of the relevant data to his satisfaction as suggested by the withdrawal of his motion directing the turnover. Thus, from the records it appears that the trustee knew or should have known of the trailer transfer sometime between October 29, 1990 and November 16, 1990.

Because Dakota Drilling did not disclose the Load Craft trailer in its schedule, the trustee was unable to discover the trailer transfer to Pedie Construction until the trustee filed his motion requesting information on the financial affairs of Dakota Drilling. The court believes the trustee was

reasonably diligent in his attempt to discover the transfer made to Pedie Construction. Therefore, this court finds that the trustee's action is not barred by the statute of limitations since the action was brought within the two-year statutory period.

The trustee's claim for the recovery of the Load Craft trailer, however, will be denied pursuant to 11 U.S.C. § 704 which states that the trustee can only collect property of the estate. What interest Dakota Drilling had in the Load Craft trailer was subject to the security interests held by Centerre Bank which was assigned to Earl Schwartz when Schwartz, as guarantor on the loan, paid off the debt obligations to the bank. Furthermore, on March 28, 1989, Earl Schwartz obtained relief from the automatic stay and recovered his collateral; hence, Dakota Drilling's interest in the Load Craft no longer exists. *Brown v. First Nat'l Bank of Little Rock*, 748 F.2d 490 (8th Cir.1984). (Property transferred must be the property of the bankrupt's estate.) The fact that the Load Craft trailer is currently registered in the name of Olen Pedie does not make the post-petition transfer avoidable since Dakota Drilling had no right to that piece of equipment.

Although the trustee's claim against Olen and Linda Pedie is not barred by the applicable statute of limitations, his claim, however, fails under section 704 of the Bankruptcy Code since Dakota Drilling's interest in the property disappeared after the stay was lifted. Accordingly, the trustee has no authority to pursue his claim in this bankruptcy proceeding.

5.

Finally, by his complaint the trustee argues that the payments made by Dakota Drilling to Centerre Bank and CIT within one-year prior to the bankruptcy petition, which were guaranteed by the Pedies, are preferential transfers pursuant to section 547 of the Bankruptcy Code.

A guarantor may be considered a creditor since the guarantor holds a contingent claim against the debtor should the guarantor pay the third-party creditor whose claim he has guaranteed. *Robinson v. First Nat'l Bank*, 97 B.R. 77 (Bankr. Okla.1988). Under § 547(b)(1), a transfer may be preferential as to a creditor even if another entity actually received the property transferred. The key is whether the transfer benefits the creditor. Thus, where Dakota Drilling's payments to Centerre Bank and CIT relieve the guarantors, Olen and Linda Pedie, from liability, this indirect preference would be recoverable by the trustee from the guarantors. *See In re Prescott*, 51 B.R. 751 (Bankr. W.D.Wisc.1985). This recovery by the trustee is, however, subject to the other elements of a preference being present.

In the instant case, as previously noted, Dakota Drilling was solvent when the transfers were made. Therefore, the elements for a preferential transfer has not been met. Additionally, as the facts indicate, both CIT and Centerre Bank were fully secured creditors which meant that they would have been paid in full and would have received no more than they would have obtained under a hypothetical Chapter 7 liquidation. *In re Flaten*, 50 B.R. 186 (Bankr.D.N.D.1985). Prior to the bankruptcy petition, Dakota Drilling's assets were at all times greater than the secured debts. Therefore, this court finds that the trustee has not satisfied his burden of proof under Section 547's preferential transfer.

Accordingly, for the reasons stated, IT IS ORDERED that judgment shall be entered in favor of the defendants, Olen and Linda Pedie and against the plaintiff, Phillip D. Armstrong, trustee of the estate of Dakota Drilling, Inc., dismissing all counts of the trustee's complaint.

JUDGMENT MAY BE ENTERED ACCORDINGLY.