**In re Nancy HARRIS, Debtor.**

**Douglas J. LUSTIG, Trustee of Nancy Harris, Plaintiff,**

**v.**

**Joanne C. CHWIECKO, Henry Hamlin and Margaret Furby, Defendants.**

**Bankruptcy No. 93–22778.
Adv. No. 94–2095.**

United States Bankruptcy Court,
W.D. New York.

March 24, 1995.

Robert E. Bramlet, Nixon, Hargrave, Devans & Doyle, Rochester, New York, for plaintiff.

Stephen P. Mayka, Lacy, Katzen, Ryen & Mittleman, Rochester, New York, for defendants.

JOHN C. NINFO, II, Bankruptcy Judge.

## BACKGROUND

On December 20, 1993, the Debtor, Nancy Harris, now Nancy Hamlin (the "Debtor"), filed a petition initiating a Chapter 7 case. On October 17, 1994 her trustee (the "Trustee") commenced an adversary proceeding (the "Avoidance Proceeding") against the Debtor, Joanne C. Chwiecko ("Chwiecko"), Henry Hamlin ("Hamlin"), the Debtor's husband as of July 2, 1994, and Margaret Furby,

the Debtor's mother, ("Furby") (each a "Defendant" and collectively the "Defendants"). In the Proceeding the Trustee sought to avoid certain transfers to the Defendants which he alleged were preferential or fraudulent under Sections 547, 548, 544 and 550 of the Bankruptcy Code and Article 10 of the New York Debtor and Creditor Law.

On November 4, 1994, Chwiecko interposed an Answer and on November 22, 1994, she filed a Motion for Summary Judgment (the "Chwiecko Summary Judgment Motion"), which was initially returnable on December 21, 1994. On December 13, 1994, the Trustee filed a Cross–Motion for Summary Judgment (the "Trustee Summary Judgment Motion") and on December 14, 1994, Hamlin interposed a Reply to the Chwiecko Motion and a Cross–Motion for Summary Judgment (the "Hamlin Summary Judgment Motion"). The Court took the Motions under advisement after hearing oral argument on December 21, 1994 and January 18, 1995 and at the request of the parties adjourned all scheduled pretrial conferences to a time after the Court filed its decision.

The pleadings and proceedings to date in the Avoidance Proceeding indicate that:

(1) on October 31, 1991 the Debtor, who then resided at 21 Atkinson Street ("Atkinson Street"), Rochester, New York, was the owner of condominium unit 4D at 181 Hudson Street, New York, New York, (the "Condominium");

(2) on or about October 31, 1991 the Debtor, Chase Lincoln First Bank, N.A. ("Chase Lincoln"), Chwiecko, Hamlin and Hallenbeck, Lascell and Pineo, the Debtor's attorneys ("HLP"), entered into an agreement (the "Debt Repayment Agreement");

(3) according to the Debt Repayment Agreement, on October 31, 1991, the Debtor was or believed herself to be indebted to Chase Lincoln (approximately $40,800), Chwiecko (approximately $69,000), Hamlin (approximately $6,000), Furby (approximately $10,000), the Internal Revenue Service and the New York State Depart-

ment of Taxation and Finance for various taxes (collectively approximately $25,000) and HLP (approximately $7,500);

(4) among its provisions, the Debt Repayment Agreement provided that: (a) HLP would hold legal or equitable title to the Condominium and work with real estate brokers, in consultation with Chase Lincoln and Chwiecko, to bring about a fair market value sale within six months; (b) HLP was "acting as a trustee or fiduciary for the benefit of all Parties"; (c) in the event that there was a sale acceptable to Chase Lincoln and Chwiecko, the proceeds would be distributed to the parties to the Agreement, the Internal Revenue Service, the New York State Department of Taxation and Furby in accordance with a schedule set forth in the Agreement; (d) the sale proceeds distribution schedule provided for the payment of a first mortgage to Dime Savings Bank ("Dime") (approximately $185,000) and closing expenses, next for a pro rata distribution of the remaining proceeds until the benefitted creditors were paid their principal indebtedness in full, then pro rata interest at 9% per annum and then any remaining proceeds to be paid to the Debtor; (e) Hamlin could, but was not obligated to, make payments to Dime to keep its mortgage current, with any such advances being reimbursed from the net proceeds prior to the payment of the pre-existing indebtedness; (f) in the event the Condominium was not sold or a binding agreement for the sale received prior to April 15, 1992, Chase Lincoln and Chwiecko "may, by written notice to all other Parties", extend the Agreement on a month to month basis or terminate the Agreement; (g) upon termination of the Agreement at the election of Chase Lincoln and Chwiecko, HLP was to deliver title to the Condominium to Harris; (h) HLP could, but was not obligated to, deliver title to the Condominium to any

bankruptcy trustee if a petition in bankruptcy was filed by or against the Debtor prior to a sale of the Condominium or the termination of the Agreement; (i) for so long as the Agreement was in full force and effect Chase Lincoln, Chwiecko and Hamlin agreed to forebear from commencing suit against the Debtor; and (j) Chase Lincoln was to receive payments of $550 per month representing one-half of a rent receivable at Atkinson Street;

(5) the Debt Repayment Agreement was extended by the parties through August 15, 1992, however, by letter dated August 17, 1992 Chase elected to terminate the Agreement;

(6) on or about September 30, 1992, the Debtor, Chwiecko, Hamlin and HLP entered into an agreement (the "Subsequent Debt Repayment Agreement");

(7) the Subsequent Debt Repayment Agreement, which had attached to it a copy of the Debt Repayment Agreement, in its recitals indicated that: (a) the Debtor had incurred various debts to the parties to the Agreement as well as to Chase Lincoln, Furby, the Internal Revenue Service and the New York State Department of Taxation and Finance, and further indicated that "Harris hereby reaffirms the Debts and by this Agreement seeks to provide for their orderly payment." (the Agreement estimated the total of these debts to be approximately $183,589); (b) the Condominium was believed to have a fair market value of in excess of $325,000; (c) there was approximately $185,000 due on the Dime mortgage, unpaid real estate taxes of approximately $8,500 and unpaid condominium charges of approximately $5,000; (d) Hamlin had and was willing to continue to advance additional funds to keep the Dime mortgage current; and (e) "[t]he Parties wish to set forth their understanding with respect to the claims of Hamlin, Chwiecko and HLP against

Harris, and Harris wishes to set forth her understanding as to the payment of these claims."

(8) the Subsequent Debt Repayment Agreement stated that: "NOW, THEREFORE, in consideration of the amounts advanced or to be advanced by Hamlin, Chwiecko and HLP, and in further consideration of the forbearance by each of them with regard to the collection of their obligations, IT IS AGREED AS FOLLOWS:";

(9) among its provisions, the Subsequent Debt Repayment Agreement provided that: (a) HLP delivered the deed to the Condominium given to it by the Debtor pursuant to the terms of the Debt Repayment Agreement to Hamlin and Chwiecko, who "agree to record the deed and to hold legal or equitable title to the Property, to seek to sell the Property for its reasonable fair market value within six (6) months of the date hereof and to distribute the proceeds of sale as set forth in Section 4 hereof"; (b) any offer in excess of $320,000 would be deemed acceptable and would be accepted by Hamlin and Chwiecko; and (c) upon a sale of the Condominium, the net proceeds, after payment of the Dime mortgage, real estate taxes, condominium charges, closing costs and other charges, were to be distributed first to pay to Chwiecko and Hamlin any advances made by them to pay the mortgage or to preserve and maintain the Condominium and then essentially the same as in the Debt Repayment Agreement, except that no provision was made for the repayment of any indebtedness due to Chase Lincoln;

(10) attached as Exhibit C to the Answer interposed by Hamlin in the Avoidance Proceeding was a copy of a mortgage on the Condominium in favor of Hamlin for $19,500, executed on October 30, 1991 and recorded on November 7, 1991 (the "Hamlin Mortgage");

(11) the Hamlin Mortgage was not mentioned in the Debt Repayment Agreement executed the day after the Mortgage was executed, but it was specifically provided for in the Subsequent Debt Repayment Agreement;

(12) on or about November 12, 1992, Chase Lincoln commenced an action against the Debtor in New York State Supreme Court (the "State Court Action") for in excess of $27,000, representing the amounts then due on two promissory notes;

(13) copies of the Summons and Complaint in the State Court Action were served by mail on HLP on or about November 12, 1992 and on the Debtor by mail on or about December 17, 1992;

(14) on December 4, 1992, a deed to the Condominium to Chwiecko and Hamlin was recorded in the Office of the Clerk of New York County (the "Hamlin Deed");

(15) it does not appear that either mortgage taxes or transfer taxes were paid at the time of the recording of the Hamlin Deed;

(16) a judgment (the "Chase Lincoln Judgment") was entered in favor of Chase Lincoln in the State Court Action on May 6, 1993 and was transcribed to New York County on July 1, 1993;

(17) on June 17, 1993, the Condominium was sold to a third party for a purchase price of $340,000;

(18) copies of the 1992 and 1993 income tax returns of the Debtor, Chwiecko and Hamlin, which would show how those parties treated the recording of the Hamlin Deed or the sale of the Condominium for tax purposes, have not been filed with the Court;

(19) on June 17, 1993, after the payment of the Dime mortgage, closing costs and related charges, proceeds from the sale of the Condominium in the amount of $131,100.58 were paid to an attorney as the escrow agent for Hamlin and Chwiecko (the "Escrow Agent");

(20) in July, 1993, the Escrow Agent distributed net proceeds from the sale

of the Condominium to Chwiecko, Hamlin, HLP, Furby and the taxing authorities in accordance with the provisions of the Subsequent ·Debt Repayment Agreement, resulting in Hamlin, Chwiecko, HLP, Furby and the taxing authorities receiving approximately 56% of their pre-Agreement indebtedness, however, no funds were distributed to Chase Lincoln;

(21) of the July, 1993 distributions from the Escrow Agent, Chwiecko received payments of: $3,337.15 as repayment of the advances made by her after December, 1992 for maintenance, operation and sale of the Condominium, and $41,943.91 on her pre-Subsequent Debt Repayment Agreement indebtedness due from the Debtor;

(22) of the July, 1993 distributions from the Escrow Agent, Hamlin received payments of: (a) $22,354.88 (probably on the Hamlin Mortgage); (b) $3425.49; (c) $26,982.91 and (d) $8,725.84;

(23) the Trustee's Complaint in the Adversary Proceeding set forth the following causes of action against Chwiecko:

(a) the First Cause of Action under Section 548(a)(1) alleged that an interest in the Condominium was transferred by the Debtor to Chwiecko with actual intent to hinder, delay and defraud her creditors other than those creditors that were parties to or provided for by the Subsequent Debt Repayment Agreement;

(b) the Second Cause of Action under Section 548(a)(2) alleged that an interest in the Condominium was transferred by the Debtor to Chwiecko for less than a reasonably equivalent value at a time when the Debtor was insolvent or was rendered insolvent as a result of the transfer;

(c) the Third Cause of Action under Section 273 of the New York Debtor and Creditor Law alleged that an interest in the Condominium was transferred by the Debtor to Chwiecko without fair consideration at a time when the Debtor was insolvent or rendered insolvent as a result of the transfer;

(d) the Fourth Cause of Action under Section 276 of the New York Debtor and Creditor Law alleged that an interest in the Condominium was transferred by the Debtor to Chwiecko with actual intent to hinder, delay or defraud her creditors, other than those creditors that were parties to or provided for by the Subsequent Debt Repayment Agreement;

(e) the Fifth Cause of Action under Section 276–a of the New York Debtor and Creditor Law, requested reasonable attorney's fees in connection with the action to the extent that the transfer of the Condominium to Chwiecko was made with the actual intent to hinder, delay or defraud creditors at a time when Chase Lincoln had commenced the State Court Action; and

(f) the Sixth Cause of Action under Section 547(b)(1), alleged that the payments made to Chwiecko in July, 1993 were avoidable preferential transfers to an insider within the meaning and intent of Section 547(b)(4)(B).

(24) in their Motions for Summary Judgment, Chwiecko and Hamlin have asserted that:

(a) the Trustee had agreed to withdraw the First and Second Causes of Action against Chwiecko because if the transfer to Chwiecko of an interest in the Condominium was a fraudulent conveyance, it was not avoidable under Section 548 since the transfer, which occurred at the latest on December 4, 1992 when a deed to the Condominium was recorded, occurred more than one year prior to the filing of the Debtor's petition on December 20, 1993;

(b) as to the Trustee's Sixth Cause of Action to avoid the payments made to Chwiecko in July, 1993 as prefer-

ential: (i) such payments were made more than ninety days before the date of the filing of the Debtor's petition on December 20, 1993; and (ii) Chwiecko was not an insider within the meaning and intent of Sections 547(b)(4)(B) and 101(31), so that the extended one year reach-back period was not available to the Trustee;

(c) as to the Trustee's Third Cause of Action, to the extent that the transfer of an interest in the Condominium to Chwiecko by deed recorded December 4, 1992 was alleged to be a fraudulent conveyance under Section 273 of the New York Debtor and Creditor Law, as an outright transfer or a transfer intended as security, it was not a fraudulent conveyance to the extent of the indebtedness owed to Chwiecko by Harris at that time, or for advances thereafter made by Chwiecko, since notwithstanding the Debtor's solvency or insolvency, such transfer was made for fair consideration within the meaning and intent of Section 273 of the New York Debtor and Creditor Law; and

(d) as to the Trustee's Fourth and Fifth Causes of Action, the Trustee had failed to set forth any facts sufficient to establish an intent on the part of the Debtor to hinder, delay or defraud creditors, and no such attempt was made by the Debtor;

(25) at no time prior to the filing of the Debtor's petition did the parties to the Subsequent Debt Repayment Agreement advise Chase Lincoln of the Agreement, the recording of the Hamlin Deed, the sale of the Condominium or the distribution of the proceeds of the sale of the Condominium, nor did Chase Lincoln otherwise learn of these events.

## DISCUSSION

### I. *Summary Judgment*

■ Although there may have been extensive discussions among the parties prior to its commencement, there has been no formal discovery and no pretrial conference conducted in this Adversary Proceeding.

It also appears that there was substantial time and effort devoted by perhaps numerous professionals to the planning, preparation and implementation of the Subsequent Debt Repayment Agreement.

As a result, it appears that there are a multitude of potential legal determinations which the Court may be required to make in this Proceeding after the determination of a great number of potential factual disputes. To speculate upon or decide, in whole or in part, many of these potential legal issues is inappropriate at this time when these underlying material facts have not been determined and have not even been fully developed and presented, in part because of the lack of discovery. For example, it is not even clear at this time whether the recording of the Hamlin Deed, in connection with which no transfer or mortgage taxes appear to have been paid, constituted a transfer of a legal, merely equitable or a fiduciary or agency interest in the Debtor's property to Hamlin and Chwiecko. As a result, although alternative pleading is permissible at this early stage of the proceeding, many of the arguments advanced by the parties would be mutually exclusive and could be easily resolved if there was a final determination of the intent of the parties and, therefore, the legal result of the delivery and recording of the Hamlin Deed. Therefore, summary judgment at this stage in the Avoidance Proceeding is premature.[1]

Nevertheless, it appears that there are several issues that the Court can and should address at this time in order to move the matter forward. These issues are: (1) whether if there was a transfer of an interest, outright or as security, in the Condomin-

---

1. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 55 (2d Cir.1987) ("The procedural tool of summary judgment enables courts to terminate meritless claims, but this potent instrument must be used with the precision of a scalpel. The courts must take care not to abort a genuine factual dispute prematurely and thus deprive a litigant of his day in Court.")

ium to Chwiecko and Hamlin by the Hamlin Deed recorded in New York County on December 4, 1994, because it was a transfer: (a) to a creditor; (b) in connection with an antecedent debt; (c) therefore in whole or in part for fair consideration or reasonably equivalent value; and (d) arguably only a preference as defined in Section 547, could it also be an avoidable fraudulent transfer; (2) whether either Chwiecko or Hamlin could be found to be an "insider" should any of the amounts paid to them from the proceeds of the sale of the Condominium otherwise be found to be avoidable preferential transfers; and (3) whether the repayments to Chwiecko and Hamlin for advances made by them after the recording of the Hamlin Deed could be found to be avoidable transfers.

## II. Can a Transfer be Both a Preference as Defined in Section 547 and an Avoidable Fraudulent Transfer?

■ Although the Court agrees with the assertion by Chwiecko and Hamlin throughout their pleadings in support of their Summary Judgment Motions that a transfer which might otherwise be avoidable as a preference, except for the fact that it occurs outside of the applicable ninety-day or one year period provided for under Section 547(b)(4), cannot also be a constructively fraudulent transfer under Section 548(a)(2) or applicable state law because it is for a reasonably equivalent value or fair consideration, the Court believes that such a transfer can nevertheless be an avoidable fraudulent transfer, under Section 548 or any applicable state law available to the Trustee under Section 544, if it is made with actual intent to hinder, delay or defraud a creditor or creditors generally.[2]

Although it is alleged by the Debtor and the other Defendants, as supported by an Affidavit of the Debtor, that the purpose of the Subsequent Debt Repayment Agreement was only to provide for the repayment, in whole or in part, of the valid obligations due or to become due from the Debtor to Chwiecko, Hamlin, Furby and the taxing authorities (which is consistent with some but inconsistent with other language contained in the Agreement; for example, the Agreement recites that it is to provide for the orderly payment of the Debts of the Debtor as defined therein, including a debt to Chase Lincoln), it is clear from all of the facts and circumstances presented to date that the Agreement was also a "freeze-out" of Chase Lincoln.[3] Furthermore, this was a "freeze-out" at a time when it appears that: (1) as supported by the Affidavit of the Debtor, it was not expected that the Condominium would sell for an amount sufficient to pay in full all of the debts provided for in the Subsequent Debt Repayment Agreement and still result in funds being returned to the Debtor; (2) the Debtor's attorneys knew that Chase Lincoln had commenced the State Court Action; and (3) Chase Lincoln after the termination of the Debt Repayment Agreement was never advised of the intent to enter into or the existence of the Subsequent Debt Repayment Agreement.

■ There appears to be a genuine issue of material fact as to the Debtor's intention in this case. Whether it was the Debtor's intention in part to hinder, delay or defraud Chase Lincoln by the execution and implementation of the provisions of the Subsequent Debt Repayment Agreement is a question of fact to be determined from the Debtor's testimony, with an opportunity for the Court to assess her credibility, notwithstanding either the Affidavit of the Debtor or: (1) the language of the Agreement; (2) the circumstances surrounding the execution

---

**2.** Of course, a merely preferential transfer could also be an avoidable constructively fraudulent transfer, in whole or in part, to the extent that it was for less than reasonably equivalent value or fair consideration. The Court also acknowledges that every merely preferential transfer may incidentally hinder or delay other creditors. See *Irving Trust Co. v. Chase National Bank*, 65 F.2d 409, 410 (2d Cir.1933); *In re Rubin Brothers Footwear, Inc.*, 119 B.R. 416, 423 (S.D.N.Y. 1990).

**3.** In *In re Spearing Tool & Mfg. Co., Inc.*, 171 B.R. 578, 582 (Bankr.E.D.Mich.1994), applying Michigan Law to somewhat similar circumstances but where the transaction was not specifically argued to be a mere preferential transfer, the Court found that the intent required to find an avoidable fraudulent transfer is satisfied when the transfer is motivated in whole or in part by a desire to hinder, delay or defraud creditors.

and implementation of the Agreement; and (3) the timing of the filing of the Debtor's bankruptcy petition, which themselves may provide the bases for fairly strong inferences as to the Debtor's actual intent.

## III. *Insider Preferences*

■ Section 101(31) of the Bankruptcy Code sets forth a non-exclusive definition of "insider" for the purpose of determining whether there has been an avoidable preferential transfer under Section 547. Whether an individual is an insider within the meaning and intent of Section 101(31) and Section 547 is a question of fact to be determined on a case by case basis. The essential determination to be made in this case where the defendants do not fall into the specific categories enumerated in Section 101(31) is whether such an individual was in a position of influence and control over the Debtor to a degree beyond that of an ordinary, arms-length creditor by reason of a relationship which is similar at least in some respects to one of affinity. *See In re McIver,* 177 B.R. 366 (Bankr.N.D.Fla.1995). On all of the facts and circumstances of this Adversary Proceeding to date, including the participation of Chwiecko and Hamlin in the two Debt Repayment Agreements, the Court cannot say with certainty that Chwiecko and Hamlin could not be found to be insiders within the meaning and intent of Section 101(31). It appears that Chwiecko may be the Debtor's long-time accountant who held an equity interest in FURBY Global Concepts Ltd. in which the Debtor was an officer, shareholder or director. It is also interesting that on a Settlement Statement attached as an exhibit to Chwiecko's pleadings, which shows the July distributions made by the Escrow Agent from the sale of the Condominium, all of the parties are referred to by either initials or their last names except for Chwiecko, who is referred to as "Jody". As to Hamlin, he and the Debtor were married on July 2, 1994 and appear to have been courting at the time the transactions in question took place.

At this very early stage of the Adversary Proceeding, the Trustee has had no opportunity to have reasonable discovery regarding the possible insider status of Chwiecko and Hamlin. However, there appears to be enough of a relationship between Chwiecko and the Debtor and between Hamlin and the Debtor to warrant his having such an opportunity.

## IV. *Good Faith Transferee, Section 550(d)* [4]

■ Once again, whether the repayment of the advances made by Chwiecko and Hamlin after the recording of the Hamlin Deed may be avoidable depends initially on a final determination as to the legal result of the delivery and recording of the Hamlin Deed. To the extent there is found to have been an unavoidable outright transfer of the fee interest or a mortgage to secure past and future advances, the repayment of the advances from the proceeds of the sale of the Condominium would not be avoidable. To the extent that the legal result of the recording of the Hamlin Deed is found not to have been an unavoidable outright transfer of the fee interest or a mortgage, the repayment of the advances may be avoidable.

Chwiecko and Hamlin have asserted that the advances are "improvements" as defined under Section 550(d)(2), so that even if the transfer of an interest in the Condominium to Chwiecko and Hamlin is found to have been an avoidable fraudulent transfer, the repayment of the good faith advances, made to maintain or preserve the property or to repay superior secured debt would not be avoidable or recoverable. However, for such improvements and advances not to be avoidable, should Section 550(d) or its principles be applicable [5], the transferee must be found to be a "good faith transferee". On the facts and circumstances of this case, where Chwiecko and Hamlin clearly knew of the distressed financial condition of the Debtor and that the execution and implementation of the Subsequent Debt Repayment Agreement

---

**4.** This case was filed before October 22, 1994 when the 1994 Amendments redesignated this as Section 550(e).

**5.** Section 550(d) does not appear to be applicable when the property transferred can no longer be recovered and the trustee's remedy is the recovery of value.

would result in the nonpayment and "freeze-out" of Chase Lincoln, Chwiecko and Hamlin do not appear to meet the good faith transferee standard set down by the courts which have addressed this issue.[6]

## CONCLUSION

The Motions for Summary Judgment by Chwiecko, Hamlin and the Trustee are in all respects denied.

**IT IS SO ORDERED.**

---

**6.** *See e.g., In re Hickey,* 168 B.R. 840, 848–49 (Bankr.W.D.N.Y.1994); *In re O'Connell,* 119 B.R. 311, 317 (Bankr.M.D.Fla.1990) (transferees not "good faith transferees" because of knowledge of transferor's poor financial condition at the time of the transfer); *In re Carr,* 34 B.R. 653, 657 & n. 2 (Bankr.D.Conn.1983), *aff'd,* 40 B.R. 1007 (D.Conn.1984); *In re Greenbrook Carpet Co., Inc.,* 22 B.R. 86, 90–91 (Bankr.N.D.Ga.1982) (knowledge of insolvency creates the inference of bad faith).