**In re INTERSTATE CIGAR CO., INC., and as successor by merger to L.S. Amster & Co., Inc., Debtor.**

**Committee of Unsecured Creditors of Interstate Cigar Co., Inc., and as successor by merger to L.S. Amster & Co., Inc., Plaintiff**

v.

**Interstate Distribution, Inc., and Congress Financial Corporation, Defendants.**

**Bankruptcy No. 890–81248–478.**
**Adversary No. 890–8249–47.**

United States Bankruptcy Court,
E.D. New York.

Nov. 25, 2002.

Stewart, Occhipinti & Makow, LLP, By Frank S. Occhipinti, New York City, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Congress Financial Corporation.

Pryor & Mandelup, LLP, By Randolph White, Westbury, NY, Borges Donovan, By J. Ted Donovan, New Hyde Park, NY, for the Official Committee of Unsecured Creditors.

Parker, Duryee, Rosoff & Haft, By William M. Rifkin, New York City, for Interstate Distribution, Inc.

## MEMORANDUM DECISION AND ORDER

DOROTHY EISENBERG, Bankruptcy Judge.

This matter is before the Court pursuant to a motion by Congress Financial Corporation ("Congress" or "Defendant") seeking reconsideration of this Court's Memorandum Decision, its subsequent Orders entered on June 22, 2002 (the "June 22 Order") and August 23, 2002 (the "August 23 Order") and the Judgment against Congress entered thereon on August 23, 2002 (the "Judgment"), pursuant to Bankruptcy Rules 9023 and 9024. The following consists of the Court's findings of fact and conclusions of law pursuant to Bankr. Rule 7052.

### BACKGROUND AND FACTS

A complete recitation of the facts of this adversary proceeding is set forth in the Court's memorandum decision dated May 16, 2002 (the "May 16th Decision"). The following facts are relevant to this motion before this Court. On September 6, 1990, the Committee of Unsecured Creditors of Interstate Cigar Co., Inc. (the "Committee") filed this adversary proceeding against Interstate Distribution, Inc., ("IDI") and its lender, Congress, alleging several causes of action arising from the March 7, 1990 sale by Interstate Cigar Co., Inc. (the "Debtor") to IDI of substantially all of the assets of the Debtor's Health and Beauty Aids division comprised of inventory, equipment and accounts receivable (the "Transferred Assets"). Congress financed IDI's acquisition of the Transferred Assets from the Debtor, and received a blanket security interest in the Transferred Assets to secure its initial loan upon the acquisition, and its continued lending to IDI after the acquisition.

In connection with the sale of the Transferred Assets to IDI, the CitiGroup ("CIT") (the Debtor's then secured lender) and the Debtor entered into a termination agreement dated March 7, 1990. (Plaintiff's Exh. J). Pursuant to the termination agreement, CIT released its lien on the Transferred Assets to be transferred conditioned upon receipt by CIT of full and final payment of all amounts owed to CIT by the Debtor. The termination agreement specifically states:

Concurrently herewith or prior hereto:

(I) you have paid or caused to be paid to [CIT] the outstanding balances due and owing by you to us under the note. . . .

(Plaintiff's Exh. J). Congress obtained from CIT confirmation that it had released its lien in the transferred assets, as of the date of the closing, March 7, 1990, pursuant to a certain bounced check indemnity letter. (Plaintiff's Exh. K). In the bounced check indemnity letter, CIT made the following statement:

The CIT Group/Manufacturers Hanover, Inc. confirms and agrees that (a) it has released its security interest and lien on the purchased assets, and (b) it will not assert any claim as an unpaid creditor of the seller against the buyer or the purchased assets based upon the non-compliance with applicable bulk sales laws.

(Plaintiff's Exh. K).

The Defendant also entered into a loan agreement dated March 7, 1990 with IDI, entitled "Additional Representations, Covenants, and Terms—Supplement to Accounts Financing Agreement (Security Agreement) dated the date hereof" (Plaintiff's Exh. L). Paragraph 2(e) provides:

2. *Conditions Precedent.* We acknowledge and agree that you will not entertain any request from us for loans, advances, or other extensions of credit under the financing agreement or any supplement thereto, unless and until the following agreements have been satis-

fied: ... (e) Termination of Liens. You shall have received such duly executed UCC–3 terminations, assignments and releases and other instruments, in form and substance satisfactory to you [Congress], as shall be necessary to terminate, release and satisfy all security interests in and liens on our assets and properties, including without limitation all security interests and liens in favor of CIT. No CIT obligation shall remain outstanding except for up to $1,300,000 which shall remain the sole obligation of Interstate Cigar. We shall have made arrangements satisfactorily in form and substance to you regarding the purported security interest of American Cyanamid.

(Plaintiff's Exh. L). IDI also warranted and represented "[A]ll CIT obligations have been fully satisfied, except for up to $1,300,000.00 which shall remain the sole obligation of Interstate Cigar, and all security interests in and liens on the collateral of CIT have been terminated, released and satisfied."

Section 5.1 of the Agreement of Sale transferred to IDI the assets at issue "free and clear of any liens thereon." Notwithstanding these representations, UCC–3 termination statements terminating CIT's security interests in all of the assets transferred by the Debtor to IDI were recorded post-closing.

The trial court, which heard and determined the issues of liability against Congress, and ultimately, the Appellate Division, Second Department, held that the transaction between the Debtor and IDI was subject to the notice requirements imposed by Article 6 of the Uniform Commercial Code (the "Bulk Sales Law"), and that Congress was liable for such failure to comply with the notice requirements as a subsequent transferee of the assets in

question. The Appellate Division made the following findings:

Congress was granted a security interest in the transferred assets upon financing the transaction on behalf of IDI. It later perfected its security interest by filing Uniform Commercial Code financing statements. **Accordingly, Congress falls within the Uniform Commercial Code's definition of a purchaser for the purpose of this transaction.** *(See UCC–1—201 [32], [33] ).* **As such, it can be held liable as a purchaser of ICC's assets pursuant to UCC—6—110(1).** The record reveals that Congress was aware of the terms and conditions of the Agreement of Sale, wherein the parties agreed to waive compliance with the Uniform Commercial Code Article 6. Furthermore, Congress took care to insure that ICC's lender agreed not to assert any claim as an unpaid creditor of ICC based upon the non-compliance with applicable provisions of the Uniform Commercial Code Article 6. Accordingly, we conclude that Congress was aware of the non-compliance with the Uniform Commercial Code Article 6 and therefore took its security interest in the transferred assets subject to the defect created by the non-compliance.

(Emphasis added). Congress has moved in the New York Court of Appeals for leave to appeal the decision by the Appellate Division, Second Department, which motion has recently been denied.

With the State Court having determined that Congress was liable as a purchaser under the Bulk Sales Law and that Congress had knowledge that the transaction did not comply with the Bulk Sales Law, the Committee moved for summary judgment as to damages in this Court. By memorandum decision dated May 16, 2002, this Court granted the Plaintiff's motion for summary judgment and awarded dam-

ages against Congress in the principal amount of $14,976,662 (the "May 16th Decision"). This amount reflects the book value of the inventory and equipment transferred to IDI, upon which Congress had a lien. Thereafter, the Court entered judgment against Congress in the amount of $31,103,454.14, which sum included $16,126,789.14 in prejudgment interest.

Congress' Motion for Reconsideration as revised was filed on September 10, 2002. In the Motion for Reconsideration, Congress alleges that this Court overlooked controlling law and/or misapprehended material facts when it:

1) found that the Committee could recover the full book value of the transferred inventory and equipment from Congress under 11 U.S.C. § 550, but failed to take into account 11 U.S.C. § 550(e)(1), which permits a good faith transferee to retain a lien on the assets transferred equal to the lesser of the costs incurred in improving the property transferred post-transfer or the increase in value of the property so improved;

2) failed to take into account the fact that Congress merely had a lien on the inventory and equipment transferred to IDI as opposed to an ownership interest in the inventory and equipment transferred to IDI;

3) failed to determine the amount Congress actually received from the enforcement of its security interest in the transferred inventory and equipment;

4) misapplied the decision of *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) when it determined damages against Congress based on the value of inventory and equipment received by IDI instead of the amount Congress realized from enforcement of its security interest in the inventory and equipment;

5) failed to recognize that the value of the transferred inventory and equipment was less than the $18.25 million that Congress paid to CIT in satisfaction of its prior perfected lien and that, therefore, Congress' security interest in the transferred inventory and equipment was exempt from the Bulk Sales Law and not subject to avoidance under 11 U.S.C. § 544; and

6) failed to give effect to an *alleged* finding by this Court in *Committee of Unsecured Creditors v. Interstate Cigar Distribution, Inc. (In re Interstate Cigar Co., Inc.)*, 240 B.R. 816, 822 (Bankr. E.D.N.Y.1999), that Congress is subrogated to CIT's lien in the Transferred Assets and that Congress is entitled to a credit for the $18.25 million it previously paid to CIT in respect of its lien.

The Plaintiff filed Opposition to the Motion for Reargument on October 7, 2002, alleging, *inter alia*, that (I) Congress presented no grounds for granting the motion to reargue, (ii) the arguments raised in Congress' motion were either properly rejected by this Court in its prior decision or that the arguments raised are barred as they constitute new theories never raised before by Congress, and (iii) the motion by Congress is nothing more than an attempt to obtain another "bite of the apple." Congress filed a Reply on October 19, 2002, and this Court heard oral argument on October 24, 2002. Thereafter, Congress and the Plaintiff were each permitted to file additional responsive papers and the matter was marked submitted.

### DISCUSSION

1. *Standards for Reconsideration or Reargument.*

Bankruptcy Rule 9023 authorizes a party to move for the reconsideration of a bankruptcy court's decision. Rule 9023 makes Fed. R. Civ. Pro. 59 applicable to cases under the Bankruptcy Code. As in-

corporated, Rule 59(e) of the Fed. R. Civ. Pro. provides that:

A new trial may be granted to all or any of the parties and on all or any of the issues ... (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Bankruptcy Rule 9023.

■■■■ Reconsideration is granted to permit a court to correct "an error in interpreting the facts or the law or when there has been a significant change in the law or facts since submission of the issue to the court." *Sundial Asphalt Co., Inc. v. V.P.C. Investors Corp.*, 147 B.R. 72, 84 (E.D.N.Y.1992). However, Rule 59(e) is not intended " 'to give an unhappy litigant one additional chance to sway the Judge...' Accordingly, it may not be used as a 'vehicle for bringing before the court theories or arguments that were not advanced earlier...' (Citations omitted.)." *Air Espana, et al. v. Una O'Brien*, 1997 WL 803756 at *4, 1997 U.S. Dist. LEXIS 20397 at *3 (E.D.N.Y.1997).

Bankruptcy Rule 9024, which incorporates Fed. R.Civ. Pro. 60, provides:

On motion and upon such terms as are just, the court may relieve a party or party's legal representative from a final judgment, order, or proceeding for the following reasons: (6) any other reason justifying relief from the operation of the judgment.

Bankruptcy Rule 9024.

■■■■ First, this Court must determine whether it is appropriate to consider these arguments in the context of this motion. In order to answer this question affirmatively, the Court must find that it overlooked "controlling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court." *Range Road Music, Inc. v. Music Sales Corp.*, 90 F.Supp.2d 390 (S.D.N.Y.2000). Alternatively, the Court must find that the movant has demonstrated "the need to correct a clear error or prevent manifest injustice." *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F.Supp.2d 365 (S.D.N.Y. 1999). However, in reviewing the papers filed by Congress and considered by the Court prior to issuance of the May 16th Decision, it is obvious that a number of the present arguments were never previously raised by Congress either directly or indirectly, and therefore this Court could not be charged with "overlooking" an argument or any relevant controlling case law in support. The only grounds remaining for considering any of these arguments is if the Court finds that failure to do so will result in clear error or manifest injustice.

Based on a careful review of its prior decisions, the state court decisions finding that Congress is liable under the Bulk Sales Law and relevant case law, the Court is unpersuaded by Congress' argument.

The Court notes that Congress has elected to add theories or arguments not previously raised, and although this Court could properly deny its request to reargue, the Court chooses to address each of Congress' arguments.

2. *Applicability of 11 U.S.C. § 550(e)(1) to Reduce Congress' Liability.*

In the May 16th Decision, the Court found that the transfer of the Debtor's

inventory and equipment was avoidable pursuant to 11 U.S.C. § 544(b)(1). The portion of the transfer relating to the accounts receivable was not included because the Bulk Sales Law specifically excludes such assets from its reach. Furthermore, to the extent that the transfer could be avoided, 11 U.S.C. § 550(a)[2] enables the Debtor to recover for the benefit of the estate the book value of the inventory and equipment from Congress as an immediate transferee of IDI. The proper measurement of damages is the book value of the inventory and equipment since these had already been liquidated for the benefit of Congress prior to the commencement of this adversary proceeding, and there is no inventory or equipment to be returned to the Debtor.

While Congress' counsel did not assert in its prior papers that § 550(e)(1) of the Bankruptcy Code applied to grant to Congress a lien in the amount of $18.25 million on the value of the equipment and inventory liquidated for Congress' benefit pursuant to its blanket lien, counsel to the Committee did argue that this subsection was not applicable in Congress' case in its Affirmation in support of the Plaintiff's Motion for Summary Judgment. Therefore, although Congress is raising this defense for the first time, in the interests of a complete record, this Court will specifically address the applicability of section 550(e)(1) of the Code to Congress in light of its role in the transaction in question.

Bankruptcy Code sections 550(e)(1) and (2) provide:

(e)(1) a **good faith transferee** from whom the Trustee may recover under section (a) of this section has a lien on the property recovered to secure the lesser of—

(A) the cost, to such transferee, of **any improvements made after the transfer,** less the amount of any profit realized by or accruing to such transferee from such property; and

(B) any increase in the value of such property as a result of such improvement of the property transferred.

(2) In this subsection, "improvement" includes—

(A) physical additions or changes to the property transferred;

(B) repairs to such property;

(C) payment of any tax on such property;

(D) **payment of any debt secured by a lien on such property that is superior or equal to the rights of the trustee; and**

(E) preservation of such property. (Emphasis added).

■ In this case, Congress argues that it enhanced the value of the Transferred Assets for the benefit of the Debtor's estate by satisfying the lien that CIT held in those assets. However, Congress' argument cannot withstand scrutiny. Congress is correct to recognize that payment of a debt secured by a lien on the property transferred can constitute an improvement. However, as stated in *5 Colliers on Bankruptcy,* ¶ 550.06, pp. 550–23, 24 (15th Ed.2002):

Section 550(e) favors the good faith transferee, preventing a windfall to the estate of the cost of the post-transfer improvements to the property by the transferee. Either the initial transferee or any subsequent transferee from whom the trustee recovers the property has a lien on the property recovered (but not on value recovered) to secure its cost of post-transfer improvement.

\* \* \* \* \* \*

A transferee is given a lien only to the extent that the transferee from whom the trustee actually recovers the proper-

ty paid for or caused improvement in the property after the transfer. Thus, a subsequent transferee cannot take advantage of improvements made by prior transferees.

■ Congress is disqualified from availing itself of the protections afforded under section 550(e)(1) of the Bankruptcy Code for a number of reasons. First, Congress does not qualify as a good faith transferee. Congress asserts that since neither this Court nor the Appellate Division nor the trial court found that Congress does not qualify as a "good faith transferee" under section 550(e), Congress must be a "good faith transferee." However, Congress is mistaken as to what constitutes a "good faith" transferee under this section of the Bankruptcy Code in the context of the Bulk Sales Law, and cannot, in the face of the Appellate Division's findings, sustain its burden of proof that it is a "good faith transferee."

■ "Good faith" is not a defined term in the Bankruptcy Code, and is properly determined on a case-by-case basis. *In re Sherman*, 67 F.3d 1348 (8th Cir. 1995) (citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir.1983)). In canvassing the relevant cases, it is apparent that a transferee is lacking "good faith" if the transferee had "sufficient knowledge" to place it on "inquiry notice" that the transaction was susceptible to avoidance. *Id.* at 1355 (citing *In re Anchorage Marina, Inc.*, 93 B.R. 686, 693 (Bankr.D.N.D.1988)). (Other citations omitted). The "type" of knowledge the transferee should have possessed depends upon the type of transaction being avoided. Although Congress asserts that a lack of good faith exists only if a finding is made that Congress had "knowledge" of fraudulent intent on the part of IDI, this is not the case under actions involving the Bulk Sales Law.

Cases which require that the transferee be exposed to facts which would put the transferee on notice that the transferor acted with fraudulent intent involve violations of statutes which include fraudulent intent as an element. An example of this would be where (I) a subsequent transferee obtains property and is found to have participated in the initial transfer, and (ii) the initial transfer is voidable as a fraudulent transfer under section 548(a)(1), which requires fraudulent intent on the part of the transferor. *In re Anchorage Marina, Inc.*, 93 B.R. at 693.

On the other hand, if the transfer is avoidable regardless of the transferor's mental state or intent, a subsequent transferee can claim a good faith defense under this subsection only if the transferee lacks knowledge of circumstances requiring further investigation of the avoidability of the transaction. In *In re Orange County Sanitation, Inc.*, 221 B.R. 323, 328 (Bankr. S.D.N.Y.1997) the Bankruptcy Court for the Southern District of New York found that the Internal Revenue Service (the "IRS") acted in good faith in accepting a check from the debtor post petition in satisfaction of debts of its principals where the IRS was falsely advised that the debtor's petition had been dismissed. In the *Orange County Sanitation* case, the bankruptcy court equated "good faith" with lack of knowledge that the transfer was avoidable. The bankruptcy court also defined "good faith" as " 'lack of actual knowledge of actual fraud [i.e., in cases where fraudulent intent is required]' **or** 'lack of knowledge of circumstances requiring further investigation.' " *Id.* (emphasis added). Although Congress cites to the *Orange County Sanitation* case in support of its assertion that a lack of "good faith" and " knowledge" can only be equated where such knowledge is of the transferor's fraudulent intent, a straightforward

reading of the case leads this Court to conclude otherwise.

In several cases cited by Congress, courts have held that lack of knowledge of the defect rendering the transfer avoidable is sufficient for a finding that the transferee acted in good faith. *See In re Lepelley (Bash v. Lepelley)*, 233 B.R. 802, 808 (Bankr.N.D.Ohio, 1999) (mortgagee which was not aware of defect in execution of mortgage caused by closing service acted in good faith under section 550(e) of the Bankruptcy Code); and *In re Farrell (Hardesty v. Equity One Credit Corp.)*, 269 B.R. 181, 187 (Bankr.S.D.Ohio, 2001) (mortgagee which was not aware of defect in description of real property in a portion of the mortgage instrument caused by the title company acted in good faith under section 550(e)(1) of the Bankruptcy Code). These courts did not even consider the transferee's knowledge of the transferor's state of mind because it is not relevant in connection with a cause of action which does not include fraudulent intent as a component of the avoidable transfer claim. If the statute giving rise to the avoidable transfer does not require that the transferor act with fraudulent intent, certainly the transferee need not possess knowledge of fraudulent intent by the transferor. All that is required is that the transferee have knowledge of the voidability of the transaction. Intent is irrelevant.

In another bankruptcy case involving recovery of a transfer which violated the Bulk Sales Law, the Bankruptcy Court for the Southern District of New York held that a purchaser of wafers pursuant to a transaction that did not comply with the notice requirements of the Bulk Sales Law acted in good faith where he had no knowledge or reason to believe that the seller was going out of business. *Matter of Curtina International, Inc. (Murdock v. Plymouth Enterprises, Inc.)*, 23 B.R. 969 (Bankr.S.D.N.Y.1982). Although § 550(e) was not at issue in that case, it is important to note that the issue of the purchaser's good faith did not turn on whether the purchaser knew of the seller's "fraudulent intent," but rather on whether the purchaser knew or should have known that the transaction was subject to the Bulk Sales Law. Likewise, Congress' assertion of "good faith" can only be supported by a finding that it knew of no facts which would lead it to believe that the Bulk Sales Law was being violated. The facts in this case clearly show that Congress knew that there was a violation of the Bulk Sales Law. The Debtor's state of mind and Congress' knowledge of the Debtor's state of mind is simply not relevant.

It is impossible for this Court to find that Congress acted in good faith because the Appellate Division and the lower court found that Congress took its security interest in the assets transferred with notice of the defect under the Bulk Sales Law, and therefore had knowledge that the transfer could be subject to recovery under the Bulk Sales Law. This Court is bound to give full faith and credit to these decisions unless they are overturned by the New York Court of Appeals. *Kelleran v. Andrijevic*, 825 F.2d 692 (2nd Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988).

Indeed, Congress took great pains to ensure that it would be insulated from the financial impact of a Bulk Sales violation where notice of the sale was deliberately withheld from the creditors of the Debtor. Congress denies that any of these actions support a finding of bad faith on its part, but the burden is on Congress under this statute to demonstrate that it acted in "good faith" with respect to the transaction and it has not done so. The Court find that Congress' knowledge that the parties were deliberately waiving compli-

ance with the Bulk Sales Law suffices to preclude this Court from finding that Congress acted in good faith in this transaction. Congress knowingly agreed to assume a risk when it financed the voidable transfer of the Debtor's equipment and inventory to IDI.. Under these circumstances, and given that the Bulk Sales Law is a strict liability statute, Congress cannot now hide behind a claim of "good faith" to reduce the judgment against it pursuant to section 550(e)(1) of the Bankruptcy Code.

■ Even if the Court found that Congress acted in good faith, Congress cannot rely on § 550(e)(1) to obtain a lien on the value of the inventory and equipment transferred back into the Debtor's estate because Congress did not improve the value of the property in question after the transfer took place. Congress insists that by taking out CIT's lien, Congress "improved" the value of the assets transferred for the benefit of the estate. However, Congress' actions did not benefit the estate because the equipment and inventory were sold to IDI unencumbered by CIT's lien.

In its memorandum decision dated May 16, 2002, this Court found that CIT had a preexisting lien on the Debtor's assets, which was satisfied by payment in the amount of $18.25 million. Upon receipt of said funds, CIT released its lien on the transferred assets and Congress was granted a security interest in the transferred assets. The memorandum decision sets forth these facts in a chronological basis, and no evidence was introduced to the Court that the transaction took place in a different order. In fact, the only evidence introduced to date in response to Congress' motion to reargue supports this Court's finding that first CIT released its lien, then the assets were transferred to IDI, and then Congress obtained a lien on the transferred assets. These documents

introduced by the Plaintiff are replete with representations from the parties that the release of CIT's lien on the inventory and equipment was to occur before the transfer of these assets to IDI.. The documents clearly reflect that the transfer of the inventory and equipment, etc. to IDI were free and clear of liens, claims and encumbrances of CIT except for the $1.3 million remaining on other assets. Even Congress admits that at best, the transaction was a simultaneous one, with all of the documents in question being executed within minutes of each other.

Congress claims that pursuant to relevant case law, the actual timing of the transaction is not as important as the fact that Congress' funds were used to pay CIT in order to have its lien released. Congress cites to a series of cases arising in Ohio bankruptcy courts where mortgagees of mortgages avoided under § 544(b) of the Bankruptcy Code due to errors in mortgage executions were granted § 550(e)(1) protection with respect to the funds the mortgagees advanced after closing to satisfy the debtor's mortgagor's prior mortgage. Although Congress states that in these cases, the signing of the loan documents and the disbursement of funds to the initial mortgage holders occurred simultaneously, a review of the facts of each case cited reveals that this is simply not true. In fact, in each of the cases in question, the subsequent mortgage documents were signed several days prior to payment of the initial mortgagee's remaining balances. *See In re Farrell (Hardesty v. Equity One Credit Corp.)*, 269 B.R. at 182 (Six days elapsed between execution of the refinancing documents and payoff of the preexisting mortgage); *In re Lepelley (Bash v. Lepelley)*, 233 B.R. at 809 (Five days elapsed between execution of the refinancing documents and payoff of the preexisting mortgage); and *In re Krueger*

*(Helbling v. Krueger)*, 2000 WL 895601 (Bankr.N.D.Ohio 2000) (Refinancing documents were signed and subsequent mortgage was recorded prior to disbursement of loan proceeds to pay off the preexisting mortgage). In addition, in the case of *In re Brown Iron & Metal, Inc. (Shults v. University of Oklahoma Foundation)*, 28 B.R. 426 (Bankr.E.D.Tenn.1983), sheds light on the requirement under § 550(e) of the Bankruptcy Code that the improvements in question must have taken place post-transfer.

The Bankruptcy Court in the Brown Iron & Metal case recognized that under the Bankruptcy Code, a distinction exists between pre-transfer and post-transfer expenditures because the trustee is entitled to recover the property in question as it existed **at the time of the transfer.** In our case, as in the Brown Iron & Metal case, the distinction between events occurring pre-transfer and post transfer cannot be ignored. Furthermore, if IDI had purchased the equipment and inventory of the Debtor "subject to" CIT's lien and then paid it off, a different result would occur. However, this was not the case and Congress is not entitled to lien protection under § 550(e) as a result.

The case before this Court is also analogous to the case *In re Sherman,* 67 F.3d 1348 (8th Cir.1995), where the Court of Appeals for the Eighth Circuit upheld the lower court's decision to deny a bank lien in the amount of sums paid at the time of transfer of real property because the release of lien occurred prior to the avoidable transfer.

 Finally, the language of § 550(e) indicates that it is limited to transactions where the property in question still exists for the trustee to recover. *In re Harris,* 195 B.R. 577 (Bankr.W.D.N.Y.1995). The reason for this limitation is that if the property in question still exists, and the debtor's estate is able to retrieve the property with these improvements, the transferee should not be denied a credit for the value of the improvements it made post-transfer. In this case, there is no "property" left to transfer back to the Debtor's estate. Any improvements that Congress could allege it made to the "property" post transfer have already benefitted Congress when the value of the "property" was liquidated for its benefit and it was repaid.

Based on the reasons set forth above, the Court finds that this Court's failure to address section 550(e) of the Bankruptcy Code in its prior decisions was not a result of clear error on its part, nor did it result in manifest injustice to Congress because this section is inapplicable to the transaction at hand.

3. *The Extent of Congress' Liability Based on the Amount of Congress' Loan.*

 Congress alleges that the Court misapprehended applicable law when it failed to recognize and take into account the limited nature and amount of Congress' security interest in the inventory and equipment that were subject to the Bulk Sales Law, as separate and apart from the ownership interest in those assets acquired by IDI. Similarly, Congress alleges that this Court erred when it failed to determine the value of the inventory and equipment for which Congress could be held to account (i.e., the amount Congress actually received from the enforcement of its security interest in the inventory and equipment and retained in satisfaction of the debt owed to Congress by IDI). In its argument, Congress correctly points out that the Bulk Sales Law does not make the non-complying party liable for all of the transferor's debts—rather, the liability of the transferee is limited to the value of the property transferred to it. *Stuart v. Elk*

*Horn Bank & Trust Co.*, 123 Ark. 285, 185 S.W. 263 (1916); *Gardner v. Goodner Wholesale Grocery Co.*, 113 Tex. 423, 426, 256 S.W. 911, 912 (Comm'n App.1923); and *Coastal Oil New England, Inc. v. Citizens Fuels Corp.*, 38 Mass.App. 26, 644 N.E.2d 258, 262–63 (1995).

Congress also argues that because the amount of the debt owed by IDI to Congress never reached the amount of $30 million, which was the book value of the entire assets transferred, Congress could have no interest in that portion of the transferred assets valued in excess of the credit it extended to IDI. In other words, Congress argues that it was an error of law by this Court not to "cap" the claim of Congress by the amount of funds it actually realized from the enforcement of its security interest and retained in satisfaction of IDI's indebtedness to Congress.

In its decision dated January 14, 2002, the Appellate Division upheld the lower court's finding that the transaction between IDI and the Debtor was subject to the Bulk Sales Law and that Congress was also liable under the Bulk Sales Law. The Appellate Division also recognized that Congress falls within the U.C.C.'s definition of a "purchaser," which is defined as a person who takes by "purchase." A "purchase" includes a taking by "sale, discount, negotiation, mortgage, pledge, lien, security interest, issue or re-issue, gift or any other voluntary transaction creating an interest in property." N.Y.U.C.C. §§ 1–201(32) and (33). Furthermore, Congress did not qualify as a good faith purchaser for value without notice of the failure to comply with the Bulk Sales Law under U.C.C. § 6–110(2). Therefore, its "purchase" of the assets in question was subject to the same infirmities as IDI's purchase, rendering the transfers ineffective against creditors of the Debtor.

Under this analysis, IDI and Congress are both deemed to be purchasers with defective title in and to the inventory and equipment as a result of the noncompliance with the Bulk Sales Law. It is undisputed that Congress had a blanket lien on all of the Transferred Assets which included account receivables and some other assets. It is also undisputed that over time, funds were advanced by Congress and repaid to it as a consequence of which all of the inventory and equipment transferred by the Debtor to IDI were liquidated for the benefit of Congress to the detriment of the Debtor's creditors. Congress' inventory account statement shows a total elimination of the $14,555,000 in inventory and equipment pledged to Congress, which this Court found had a fair market value of $13,817,284 at the time of the sale of the Debtor's assets to IDI. Therefore, Congress was the beneficiary of the equipment and inventory transferred to IDI when it liquidated IDI's assets to pay off its debt.

Congress has failed to demonstrate that the Court erred in finding that the amount of recovery is governed by the value of the assets subject to the Bulk Sales Law which were transferred to IDI and liquidated for the benefit of Congress. Congress has not provided the Court with any legal authority for either "capping" its liability by the portion of its lien covering the inventory and equipment transferred to IDI or for reducing the judgment to equal the amount Congress received from IDI for Congress' loan on the inventory and equipment.

■ Case law is clear that where the covered assets have disappeared, the proper measure of damages is the book value of the assets as of the date of the transfer, not an amount based on the value the transferee actually received for disposal of the assets in question at some later date or some other valuation. *Ex parte Harsco*

*Corp.,* 689 So.2d 845 (Ala.Sup.Ct.1997). The analysis does not change because Congress "purchased" the assets in question by obtaining a lien on the assets. The fact remains that Congress had a lien on all of the inventory, equipment and accounts receivable of the Debtor purchased by IDI, and that the creditors of the Debtor are entitled to treat Congress' blanket lien as ineffective. As to the inventory and equipment, recovery under the Bulk Sales Law is based on returning the assets, or their value, to the transferor's estate for the benefit of its creditors. Congress' concerns regarding the extent of consideration it paid for a lien on all of these assets is not part of the inquiry. Furthermore, § 550(a) of the Bankruptcy Code authorizes the trustee to recover the property transferred or its value to the extent a transfer is avoided· under relevant state law. There is no Code provision authorizing Congress to reduce its liability to reflect the amount Congress actually loaned to IDI or the amount actually repaid to Congress. *In re Rice,* 83 B.R. 8 (9th Cir. BAP 1986). Any complaints Congress may have with the value it received on the liquidation of the inventory and equipment for its benefit lie against IDI.

### 4. *Application of Moore v. Bay.*

Congress argues that the Court misapplied *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), when it failed to take into account the allegedly limited nature of Congress' interest in the transferred assets. Accordingly, Congress argues that it cannot be made to account for that which it did not receive, including any portion of the value of the transferred assets in excess of the value of the lien that Congress received which was limited by the amount of IDI's indebtedness to Congress. Congress relies on the case *In re NextWave Personal Communications, Inc.,* 235 B.R. 305, 309—310 (Bankr.S.D.N.Y.1999), *rev'd,*

*NextWave Personal Communications, Inc.,* 200 F.3d 43 (2nd Cir.1999), which held that the appropriate remedy in applying the *Moore v. Bay* doctrine is "avoidance of the entire obligation and reinstatement of the obligation to the extent of value given."

■ However, this argument regarding the limits of *Moore v. Bay* was previously argued by Congress and rejected by this Court and is not the proper subject of a motion to reargue. Congress had previously asserted that Section 548(c) of the Bankruptcy Code limits recovery of a fraudulent conveyance by the extent to which a good faith transferee gave value. This Court has already held that by its very terms, Section 548(c) does not apply to actions brought under Section 544 of the Bankruptcy Code. The *NextWave* case inappropriately applied Section 548(c) to a transfer avoided under Section 544 of the Bankruptcy Court, and this Court declines to follow it. In addition, this Court did not find, nor does it now, that Congress is a good faith transferee. Therefore, the Court refuses to reconsider its interpretation of *Moore v. Bay* and finds that Congress' argument is merely a restatement of one of its prior arguments made and rejected by this Court in its prior decision.

### 5. *Reduction of Judgment by Amount Paid to Satisfy CIT.*

■ Congress asserts that the Court misapplied prevailing law by failing to recognize that the value of the transferred inventory and equipment was less than the $18.25 million paid to CIT in satisfaction of its lien, and that Congress' security interest in the transferred inventory and equipment was therefore exempt from the requirements of the Bulk Sales Law and not subject to avoidance under 11 U.S.C. § 544. According to Congress, U.C.C.

§ 6–103(3), which exempts transfers in satisfaction or realization of a lien, applies to exempt the portion of this transaction to the extent of the $18.25 million cash payment to CIT. This argument was never raised before this Court and therefore, Congress cannot assert that the Court overlooked it when rendering its prior written decision. Therefore, the only grounds for considering this argument is that failure to do so will result in clear error or manifest injustice.

A careful review of the argument offered by Congress reveals that no error will result in failing to consider this argument because it is severely flawed. First, U.C.C. § 6–103 applies to exempt transactions from compliance with the Bulk Sales Law, not to exempt "portions" of transactions from such compliance. In fact, this subsection of Article 6 of the U.C.C. was relied on by Congress in defense of the claims asserted by the Plaintiff in the state court actions. The state courts rejected this argument, finding that where consideration is paid in excess of that required to satisfy a lien, the exception enumerated in U.C.C. § 6–103 does not apply. Congress has not cited to any applicable cases which interpret this section to mean that transactions involving, *inter alia*, transfers in satisfaction or realization of a lien are "partially exempt."

The cases cited by Congress in support of its argument, *Mid–America Industries, Inc. v. Ketchie*, 767 P.2d 416 (Okla.1989), *Sbar's Inc. v. New Jersey Art & Craft Distributors, Inc.*, 205 N.J.Super. 516, 501 A.2d 560 (App.Div.1985), and *Darby v. Ewing's Home Furnishings*, 278 F.Supp. 917 (W.D.Okla.1967) do not apply because they concern the application of provisions of Article 6 which were never enacted in New York. These cases rely on § 6–109(2) of the U.C.C. which states that an auctioneer or transferee who has made payment to particular creditors pursuant to the § 6–106 of the U.C.C. (which makes the transferee personally liable for the clams of the transferor's creditors, on a pro rata basis) is entitled to credit for the sums so paid which are properly payable to said creditors.

This Court already considered and rejected a similar argument by Congress that an individual creditor's recovery may be limited to its pro rata share of the assets recovered, as there may have existed secured creditors with priorities which would reduce the amount available to the Plaintiff. CIT had already been paid and has no lien on the assets in question. There are no prior secured lien creditors. The payment to CIT shall not serve to "limit" Congress' liability pursuant to the Court's prior decisions. For the foregoing reasons, this portion of Congress' motion to reconsider is denied.

6. *Congress' Subrogation Rights.*

Congress asserts that in the Court's prior decision rejecting the proposed settlement of this adversary proceeding, the Court found that Congress is subrogated to CIT's security interest. *Committee of Unsecured Creditors v. Interstate Cigar Distribution, Inc. (In re Interstate Cigar Co., Inc.)*, 240 B.R. 816, 822 (Bankr. E.D.N.Y.1999).[1] Therefore, according to Congress, this Court's failure to take this prior finding into account warrants a rehearing on this issue. However, this Court has never found that Congress is subrogated to CIT's rights and would therefore retain a lien on the subject assets in the amount of $18.25 million. In

---

1. By Memorandum and Order dated October 16, 2002, the District Court denied the motion of Congress for leave to appeal from the orders memorializing this Court's decision denying the approval of the proposed settlement.

its prior decision rejecting the proposed settlement, the Court was canvassing the issues and made no specific findings regarding any of the issues raised by this adversary proceeding. In connection with examining the issues, the Court set forth the arguments of the various parties, including Congress' argument that it is subrogated to CIT's rights. In reviewing the arguments forwarded by the parties, the Court was not adopting any of them. In fact, this Court specifically ruled in the May 16th Decision that any issues raised by Congress' proof of claim filed in this case are not being decided in connection with the Plaintiff's motion for summary judgment. In addition, Congress did not make subrogation arguments in its prior papers in response to the Plaintiff's present motion for summary judgment and it is therefore not ripe for reconsideration or reargument. Further, CIT was repaid prior to Congress' participation in this transaction. Therefore, it had no claim against the Debtor. There can be no Subrogation of a non-creditor. For the foregoing reasons, this portion of Congress' motion is denied.

## CONCLUSION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H) and (O).

2. Consideration of § 550(e) of the Bankruptcy Code, which was not previously addressed by Congress as a defense in its prior papers or by this Court in its May 16th Decision, does not provide grounds for the Court to reconsider its prior decision because this section of the Bankruptcy Code does not apply. Congress is not a good faith transferee of the value of the inventory and equipment of the Debtor and Congress did not improve the value of the inventory and equipment post transfer.

In addition, this section does not apply to causes of action where the value of the property is to be recovered instead of the property itself.

3. Congress' assertion that the nature of the transfer from IDI to it limits the Plaintiff's right to recover the full value of the inventory and equipment transferred was never raised by Congress prior to this motion and can only be considered by this Court if the failure to do so would result in clear error or manifest injustice. Congress' argument ignores the language and purpose of the Bulk Sales Law which renders such transfers from the Debtor to IDI ineffective as to the Debtor's creditors. The Bulk Sales Law describes Congress as a "purchaser" of those assets in question, and as such, Congress is liable for the value of the inventory and equipment as of the date of the transfer.

4. Congress' assertion that the Court misapplied *Moore v. Bay* when it failed to take into account the allegedly limited nature of Congress' interest in the Transferred Assets is incorrect and provides no grounds for granting Congress' motion to reargue. The Court refuses to reconsider its interpretation of *Moore v. Bay* which authorizes the Plaintiff to recover from Congress the book value as of the date of the transfer of the inventory and equipment upon which Congress had a blanket lien and which were liquidated for its benefit.

5. Congress' argument that the Court misapplied prevailing law by failing to recognize that the portion of the transaction relating to Congress' payment of $18.25 million to CIT was exempt from the Bulk Sales Law is incorrect. This argument was previously made by Congress in state court and rejected by the state court and on appeal. Furthermore, there is no "partial exemption" under the Bulk Sales Law which would apply to this transaction.

6. There is nothing in this Court's prior decision referring to the denial of a proposed settlement of this adversary proceeding which would warrant reargument. The Court made no findings regarding the arguments advanced by the parties to the action therein but merely restated them in support of its decision to deny the settlement.

For all the foregoing reasons, Congress' motion is denied in all respects.